Henry GRISBY, Petitioner–Appellant,

v.

James BLODGETT, Respondent–Appellee.

No. 96–36138.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 1997.

Decided Nov. 19, 1997.

Alfred Kitching, Groshong & Thornton, Seattle, Washington; Rita J. Griffith, Seattle, Washington, for petitioner-appellant.

Donna Mullen, Assistant Attorney General, Olympia, Washington, for respondent-appellee.

Before: SCHROEDER and BEEZER, Circuit Judges, and SCHWARZER,* Senior District Judge.

SCHWARZER, Senior District Judge:

## FACTUAL BACKGROUND

On March 1, 1978, Raymond Frazier bought some heroin from Michael Walker and Kip Johnson, who lived together in Walker's apartment. Frazier claimed that the heroin made him sick. He called petitioner Henry Grisby, asked him to accompany him to Walker's apartment, and told him to take "protection." Grisby borrowed a snub-nosed .38 "special." The next day Frazier and Grisby went to the Walker apartment to talk about the bad heroin. Six people lived in the apartment: Michael and Myra Walker, their two children, Joynoice and Earnest, Kip Johnson, and Arvada Williams. Kip Johnson let them in. Grisby "tested" (sniffed) the heroin that Frazier said had made him sick.

The four adult residents of the apartment were sitting around the small dining room table with Frazier when the shooting started; Grisby had his jacket in hand and was headed for the front door to leave. Frazier shot everyone at the table. Grisby was the first one hit; the bullet went through his right

biceps and into his side, lodging next to his spine. He was in great pain and bleeding profusely; blood was found on his shoes and jacket and on one of the walls of the room.

According to Grisby, he stood against the wall while Frazier walked around the table, firing extra bullets into each person to "finish them off," then killing the children. According to Frazier, Grisby took out his own gun and held it against three of the adults, assuring their deaths with an extra bullet or two.

Kip Johnson, the only surviving victim, ended up on the hallway floor, face-down, pretending to be dead. He testified that someone came and stood over him, and shot him in the back of the neck. He testified that he recognized the shoes of the person standing astride him as Grisby's, contradicting Grisby's claim that he stood against the wall and did nothing.

Both Grisby and Frazier were arrested within two days of the murders, and each made statements implicating the other. A jury convicted Grisby and his co-defendant Frazier of five counts of aggravated murder and one count of assault. Grisby was sentenced to life imprisonment without possibility of parole and is currently serving his sentence. After a direct appeal to the Washington Supreme Court and an unsuccessful state Personal Restraint Petition ("PRP"), Grisby filed this petition for a writ of habeas corpus. The district court granted summary judgment. Our review is *de novo*. *Campbell v. Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987).

## DISCUSSION

Grisby has raised numerous issues, two of which we find to be meritorious. We will address those two issues first.

### 1. Failure to Admit Evidence of Kip Johnson's Alleged "Deal"

■ Grisby contends that he was denied due process of law and a fair trial when the prosecution allegedly failed to disclose to his

---

\* Honorable William W Schwarzer, Senior United States District Judge for the Northern District of

California, sitting by designation.

lawyers a promise of leniency or immunity made to Kip Johnson.

Johnson testified at trial that he had not made any arrangements with the prosecutor. Grisby presented affidavits signed by two fellow prisoners who allegedly spoke to Johnson. According to the prisoners' affidavits, Johnson said he was willing to sign a statement and testify at trial regarding an arrangement with police detectives whereby Johnson would give false testimony in exchange for leniency.

■ The district court rejected the claim on the ground that

Grisby ... has failed to make any showing that the result of trial would have been different had this alleged deal been disclosed.

The district court applied the wrong standard. If Johnson did make a deal, as Grisby claims, the defense would have been able to impeach him with that evidence by showing bias or interest. A new trial is required if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different, i.e., "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (quoting *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

■ The proffered evidence, if true, would establish that Johnson gave perjured testimony. "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381–82 (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)). In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Court found a due process violation where the prosecution had failed to correct the record when its principal witness testified that there was no promise of leniency:

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Id.* at 269, 79 S.Ct. at 1177.

Johnson was the only government witness to the shooting, other than Frazier who had an obvious bias. Johnson's identification was suspect. Johnson identified Grisby by his shoes. Johnson initially gave a statement that Frazier had shot him. At trial he testified that after having been shot by Frazier, he was again shot by someone who straddled him and shot him in the back of his neck. Initially he could not describe the shoes of the second shooter, but, after having seen the shoes in his dreams, he later believed they were Grisby's shoes. Johnson, of course, was involved in the drug deal, and a briefcase containing cocaine, heroin, and cash were found in the apartment where Johnson lived. Yet, Johnson was never prosecuted for a drug offense. These circumstances raise serious questions concerning his credibility and might implicate the fairness of the trial.[1]

Prisoner hearsay affidavits do not meet the requirement of Fed.R.Civ.P. 56(e). In the district court, however, Grisby's counsel submitted a declaration stating that when he arrived for a scheduled interview with Johnson at the institution, Johnson had been removed and that he was unable to locate him.

In light of the circumstantial evidence of Johnson's bias and his inconsistent identification, and the fact that the district court denied a hearing on the basis of an incorrect legal standard, we remand to the district court for it to determine whether an eviden-

---

1. In a footnote in its brief, the state appears to suggest that Grisby did not exhaust this claim in the state court. If the point was raised below, the district court did not address it. We leave it to the court on remand to deal with it appropriately.

tiary hearing should be held on Grisby's claim.[2]

## 2. Imposition of Unconstitutional Sentence

■ Grisby contends that the Washington sentencing scheme denied him due process and the equal protection of the laws when he was sentenced to life without parole. *See* Wash. Rev.Code §§ 10.94, 9A.32 (repealed by Wash. Rev.Code § 10.95). Under that scheme, defendants who went to trial could receive a sentence of death or life imprisonment without possibility of parole, while defendants who pled guilty could receive no more than life with the possibility of parole. In *Robtoy v. Kincheloe*, 871 F.2d 1478 (9th Cir.1989), we held, relying on *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), that the statute under which Grisby was sentenced was unconstitutional because it penalized a defendant who chose to go to trial.

The district court distinguished *Robtoy* on the facts because Grisby, unlike Robtoy, claimed innocence, chose to go to trial and never attempted to plead guilty. It held that because Grisby maintained his innocence, "his Sixth Amendment right to a jury trial was never chilled by the unconstitutionality of the statutes." This is a false distinction. *See Norman v. Ducharme*, 871 F.2d 1483, 1485 (9th Cir.1989) (companion case to *Robtoy*; no mention of attempt to plead guilty). Robtoy was not chilled either: like Grisby, he went to trial. Moreover, both the state court and this court found that Robtoy was not permitted to change his plea to guilty. *Robtoy*, 871 F.2d at 1481–82. The constitutional vice was that the sentencing scheme punished Robtoy's exercise of the right to trial; the same unconstitutional scheme was applied to Grisby. *Id.* at 1481.

The district court further held that Grisby could not demonstrate that he was harmed by the sentencing scheme because, as found by the Washington Supreme Court in reviewing his PRP, the length of Grisby's five consecutive life sentences is the equivalent of life

without possibility of parole, the sentence he is serving. As the Washington Supreme Court said:

> Although on resentencing the Indeterminate Sentence Review Board would be required to set a minimum term on each count, the standard range sentence for any one of the murders appears to be 411 to 548 months. Since the trial court set the maximum terms to run consecutively, the Board would "virtually ha[ve] the duty" to set consecutive minimum terms as well. Consecutive mid range sentences for the five murders would total nearly 200 years.... [T]he execution-style murders of two defenseless young children is an aggravating factor that would justify either exceptionally long sentences for those counts, the setting of consecutive terms, or both.... Whatever this court's decision, Grisby will undoubtedly be in prison until he dies.

*In Re Personal Restraint of Grisby*, 121 Wash.2d 419, 853 P.2d, 901, 903 (1993) (footnotes omitted).

In *State v. Frampton*, 95 Wash.2d 469, 627 P.2d 922 (1981), a majority of the Washington Supreme Court held that there is no meaningful distinction between a sentence of life without possibility of parole and life with possibility of parole, because the Board of Prison Terms and Paroles has unfettered and unreviewable discretion to deny parole. *Frampton*, 627 P.2d at 944. A defendant who pleads guilty and receives a life sentence with possibility of parole must expect he will serve a life sentence. *Id.* We, however, held in *Robtoy* (who was one of the *Frampton* defendants) that "the difference between life sentences with and without possibility of parole is a disparity significant enough to invoke *Jackson*." 871 F.2d at 1481. In *Grisby*, the Washington Supreme Court declined to follow this court's decision. *In Re Personal Restraint of Grisby*, 853 P.2d at 906. We are nonetheless bound by *Robtoy*. *Cf., Snook v. Wood*, 89 F.3d 605, 610–11 (9th Cir.1996). Because *Robtoy* establishes that, as a matter of law, a sentence of life without

---

2. The court may also wish to permit the parties to engage in discovery. Rule 6(a), Federal Rules Governing Section 2254 Cases; *Calderon v. U.S. Dist. Court N.D. Cal.*, 98 F.3d 1102, 1104 (9th Cir.1996).

the possibility of parole is significantly different from a sentence of life with the possibility of parole, Grisby's sentence is unconstitutional. *Robtoy,* 871 F.2d at 1481. We must therefore "reverse the district court's denial of the writ of habeas corpus on the ground that [Grisby's] sentence of life without parole is unconstitutional ... [and] remand this case to the district court with the direction that it issue the writ and determine a reasonable time within which to resentence [Grisby]." *Robtoy,* 871 F.2d at 1483.

### 3. Denial of Grisby's Motion to Sever His Trial

■ Grisby asserts that the state trial court's denial of his motion to sever deprived him of a fair trial. We determine whether Grisby's conviction, following a joint trial with his codefendant, violated the Constitution, laws or treaties of the United States. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). We do not depend on the state law governing severance in state trials. *Hollins v. Department of Corrections, State of Iowa,* 969 F.2d 606, 608 (8th Cir.1992). Nor do we consider procedural rights to severance afforded in federal trials. *See Middleton v. Cupp,* 768 F.2d 1083, 1085 (9th Cir.1985). The question presented in a state prisoner's petition for a writ of habeas corpus is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp,* 926 F.2d 918, 919–20 (9th Cir.1991). To prevail, Grisby bears the burden of demonstrating that the state court's denial of his severance motion rendered his trial "fundamentally unfair." *Hollins,* 969 F.2d at 608.

■ Grisby contends that the State of Washington's spousal competency privilege prevented him from presenting "essential exculpatory evidence" during his joint trial with Frazier. If his motion to sever had been granted, Grisby claims he would have been permitted to introduce Jennifer Frazier's statement that she

> returned the call back to Raymond [Frazier] and he sounded quite upset, and I said what's the matter? He said "Jan, well, I shot up everyting. I shot up everything in the house." I said What Raymond? And

he said well, I shot up everything in the house. I said Raymond are you kidding me? He said no, the police and everything were outside and I shot Myra and them. . . . [H]e admitted that he had done it.

Even if this testimony was admitted in a separate trial, the testimony would not have clearly exculpated Grisby. Jennifer Frazier's statement merely confirms that Frazier initiated the shooting and shot each victim. It has no substantial bearing on the critical question of Grisby's participation in the murders. Grisby has, therefore, failed to demonstrate that the denial of his motion to sever resulted in prejudice great enough to render his trial fundamentally unfair.

### 4. Exclusion of Polygraph Evidence During Penalty Phase

■ Grisby argues that the trial court denied him due process by excluding the results of a polygraph test. Grisby alleges that the test indicated that Grisby was truthful when he said that he did not shoot anyone and did not know that Frazier intended to shoot anyone. The Washington Supreme Court affirmed the ruling on direct appeal. *State v. Grisby,* 97 Wash.2d 493, 647 P.2d 6, 11–12 (1982). A later decision by the Washington Supreme Court, *State v. Bartholomew,* 101 Wash.2d 631, 683 P.2d 1079 (1984) declined to follow *Grisby* and held that, under *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978), mitigating polygraph evidence may be admitted under certain conditions. Grisby contends that, under *Bartholomew,* he should have been allowed to introduce the polygraph results at the penalty phase of the trial. *See Rupe v. Wood,* 93 F.3d 1434, 1439 (9th Cir. 1996).

We do not need to consider whether exclusion of this mitigating evidence was error inasmuch as Grisby cannot show that it caused him any cognizable harm, i.e., that there was a "substantial and injurious effect on the verdict because there is a reasonable probability that, had the evidence been admitted, it would have substantially influenced at least one juror's balancing of aggravating and mitigating factors." *Rupe,* 93 F.3d at

1441. Under the Washington sentencing law in effect at the time, the jury could only choose two sentences if an aggravating factor was found: life without possibility of parole or death. The jury here found at least one aggravating factor: "[t]here was more than one victim and the said murders were ... the result of a single act of the defendant." Wash. Rev.Code § 10.94. Thus, even if the jury had heard the polygraph evidence and considered it to mitigate Grisby's culpability by showing, e.g., that "[t]he defendant was an accomplice in a murder committed by another person and the defendant's participation in the homicidal act was relatively minor," 1977 Wash. Laws ch. 206, § 4(2)(d), Grisby would still have received the same sentence. To the extent that Grisby seeks to establish that an aggravating circumstance (i.e., multiple murder) was not present, he was not entitled to present this evidence in the penalty phase because it would go *only* to a juror's "lingering doubt" about his guilt of the five murders of which he was convicted. *See Rupe,* 93 F.3d at 1441 (citing *Franklin v. Lynaugh,* 487 U.S. 164, 172–74, 108 S.Ct. 2320, 2326–28, 101 L.Ed.2d 155 (1988) (explaining that lingering doubts are not germane to mitigation because they are "not over any aspect of petitioner's character, record, or a circumstance of the offense")).

Finally, to the extent that he argues that the prosecutor's guilt phase argument would have been detrimentally affected by the knowledge that the polygraph evidence could come in at the penalty phase, and that the resulting less forceful argument would have been insufficient to persuade the jury, the argument is too speculative and attenuated to warrant relief.

### 5. Lost or Destroyed Evidence

Grisby contends that the prosecution and police, acting in bad faith, lost, destroyed, or failed to obtain potentially exculpatory evidence.

■ Government suppression of exculpatory evidence violates due process. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). None of the evidence at issue, however, is actually exculpatory and Grisby does not claim violation of *Brady.*

His contention is that the evidence was "potentially exculpatory," that "it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). The duty to preserve evidence is limited to material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and that is of such nature that the defendant cannot obtain comparable evidence from other sources. *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337.

■ Grisby claims that he was denied due process because, although blood tests on the carpet might have exculpated him, the police did not perform such tests and destroyed the carpet in 1987. Apart from a lack of evidence of bad faith, Grisby cannot show prejudice. Grisby's counsel was aware of the carpet and had the opportunity to test it; the police never interfered with his ability to do so. The prosecutor even joined in a motion to acquire the carpet from the apartment owners, in part because of Grisby's proposed tests. Because the carpet was available to Grisby for testing, the police's failure to test it did not violate due process. *United States v. Hernandez,* 109 F.3d 1450, 1455 & n. 6 (9th Cir.1997).

Nor did the destruction of the carpet in 1987 deny Grisby due process. Grisby had the opportunity to test the carpet himself before the trial, but withdrew his motion to compel testing. He made no attempt to test the carpet during the ensuing nine years. He cannot claim that the police denied him the opportunity to present his case by destroying the carpet. *Id.* at 1455 n. 6. Moreover, even if the eventual destruction of the carpet long after the trial may technically have violated a pre-trial order, it was at most negligent and there is no showing of bad faith.

■ Next, Grisby claims that the police denied him due process by failing to obtain the clothing of Kip Johnson. He argues that Johnson's clothes were potentially exculpatory because blood tests might have shown that he did not drip blood on Johnson, leading to the reasonable inference that he was not the one who stood over Johnson in the hallway.

The police attempted to obtain Johnson's clothes, initially by making inquiries at the hospital where he was taken after the shooting, and then by contacting Johnson's mother and asking her what she had done with them. She said either that she had thrown them out (her testimony at trial) or that she had burned them (a police detective's testimony at trial). There is no evidence that police procedures required the officers to search the dumpster where they might have been thrown and, unlike in *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir.1989), there is no evidence that the police acted in bad faith.

Moreover, Grisby had alternative means to prove that he was not in the hallway, such as by testing the hallway carpet and by cross-examination of Johnson.

■ Finally, Grisby contends that the police should have lifted fingerprints from the phone. Arvada Williams was on the phone when the shooting started. Her daughter in California heard her say, "Please don't do that," then three shots in rapid succession, the music being turned up, and the phone being hung up. Grisby argues that the police should have fingerprinted the phone because only Arvada Williams' killer could have hung it up. The argument is speculative. The presence-or absence-of the prints of Frazier or Grisby could be attributable to various circumstances unconnected with the murders. Moreover, there is no evidence of bad faith; negligent failure to lift fingerprints does not establish bad faith. *Villafuerte v. Stewart*, 111 F.3d 616, 625 (9th Cir.1997).

## 6. Ineffective Assistance of Counsel

Grisby contends that a reasonably effective counsel would have moved to dismiss based on loss of material evidence, would have tested the carpet, would have investigated whether Grisby, with his right arm seriously injured, could have fired any of the fatal shots, and would have had an expert test the state's theory that there were two shooters.

To be entitled to relief for ineffective assistance of counsel, Grisby must show that (1) his counsel's performance was constitutionally defective ("outside the wide range of professionally competent assistance"), and (2) a "reasonable probability that, but for counsel's ... errors, the result ... would have been different." *Strickland v. Washington*, 466 U.S. 668, 693–95, 104 S.Ct. 2052, 2067–69, 80 L.Ed.2d 674 (1984).

■ Grisby claims that counsel was ineffective for failing to make a motion to dismiss based on the police's failure to obtain Johnson's clothes. Grisby relies on *State v. Wright*, 87 Wash.2d 783, 557 P.2d 1 (1976), but *Wright* is no longer good law on this point after *Arizona v. Youngblood.* See *State v. Straka*, 116 Wash.2d 859, 810 P.2d 888, 899–900 (1991) ("To the extent [*Wright* ] explicate[s] federal constitutional principles inconsistent with recent United States Supreme Court decisions [it has been] supplanted."). Under *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), Grisby cannot establish prejudice based on counsel's failure to make a motion based on this supplanted opinion; "counsel's error would [only] have deprived respondent of the chance to have the state court make an error in his favor." *Id.* at 371, 113 S.Ct. at 843. Moreover, since the police did not have possession of the clothes at the time, the motion would, in any event, have been unsuccessful.

■ Next, Grisby claims that his counsel was ineffective for failing to pursue the testing of the hallway carpet. Grisby claims that the results of the test might have exculpated him by showing that his blood was not present in the hallway, a fact that would make it unlikely that he was Johnson's assailant.

Both the state appellate court and the district court found that it was plausible that, having considered the matter, defense counsel made a strategic decision not to pursue this line of evidence because they feared that Grisby's blood *would* be found. Under those circumstances, Grisby cannot show the requisite "reasonable probability" that the result

might have been different absent counsel's errors. *Strickland,* 466 U.S. at 693–94, 104 S.Ct. at 2067–68. In balancing Grisby's claim of prejudice against the state's interest in finality, moreover, we take into account the fact that Grisby cannot now show that the results of the test would have been in his favor, the carpet having long since been destroyed. Grisby had nine years to challenge his counsel's performance by having the carpet tested himself but raised his speculative claim of prejudice only years after the carpet was destroyed.

■ Finally, Grisby attacks his counsel's failure to show that he was right-handed and, having been wounded, could not have fired a gun. Grisby has failed to establish how expert testimony would have raised a "reasonable probability" that the outcome of the trial would have been different. Speculation about what an expert could have said is not enough to establish prejudice.

### CONCLUSION

The judgment is REVERSED and the matter REMANDED for proceedings consistent with this opinion.