**Kevin COOPER, Petitioner–Appellant,**

v.

**Arthur CALDERON, Warden of California State Prison at San Quentin, Respondent–Appellee.**

**No. 97–99030.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 20, 2000

Filed July 9, 2001

---

Robert B. Amidon, Burbank, California, David L. Bernstein, Studio City, California, and William M. McGuigan, Chula Vista, California, for the petitioner-appellant.

Frederick R. Millar, Jr., Deputy Attorney General, San Diego, California, for the respondent-appellee.

Before: JAMES R. BROWNING, RYMER, and RONALD M. GOULD,[1] Circuit Judges.

Opinion by judge RYMER; Concurrence by Judge RONALD M. GOULD; Dissent by judge JAMES R. BROWNING.

1. Judge Gould was drawn to replace Judge Wiggins. He has read the briefs, reviewed the record and listened to the tape of oral argument held on January 20, 2000.

RYMER, Circuit Judge:

California state prisoner Kevin Cooper appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition, in which he challenged his conviction for the first degree murders of Douglas Ryen, Jessica Ryen, Peggy Ann Ryen and Christopher Hughes, and attempted murder in the first degree of Joshua Ryen. Following his conviction, Cooper was sentenced to death.

■ Because Cooper filed his habeas petition before the AntiTerrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA does not apply to the merits of the appeal. However, the Supreme Court held in *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), that AEDPA does govern any habeas appeal commenced after its effective date, April 24, 1996, without regard to when the petition was filed. For this reason, Cooper needs a certificate of appealability (COA) rather than a certificate of probable cause (CPC) for this court to have jurisdiction. As Cooper could not have known that a COA rather than a CPC was required, we treat his "notice of appeal as a request for a COA on the issues raised in the briefs, and we grant a COA on those issues as to which the petitioner has made the requisite 'substantial showing of the denial of a constitutional right.'" *Morris v. Woodford,* 229 F.3d 775, 779 (9th Cir.2000) (quoting *Schell v. Witek,* 218 F.3d 1017, 1021 n. 4 (9th Cir.2000)). We conclude that he has made such a showing and so grant a COA on the issues raised in Cooper's opening brief.

On the merits, we affirm.[2]

**I**

On June 2, 1983, Cooper escaped from the California Institute for Men (CIM), a state prison. He admitted that he stayed in a vacant house (the Lease house) next door to the Ryens' residence on Thursday night, all day Friday, and Friday night; he hid in the bathroom when one of the owners of the Lease house stopped by on Saturday morning. The murders happened Saturday night. Using a hatchet or axe and a knife, he hacked to death Douglas and Peggy Ryen (37 separate wounds for Douglas, 32 for Peggy), their ten-year-old-daughter Jessica (46 wounds), and eleven-year-old Christopher Hughes (26 wounds), who was spending the night at the Ryens' home. Cooper also inflicted chopping wounds to the head, and stabbing wounds to the throat, of eight-year-old Joshua Ryen, who survived.

At the Lease house, a blood-stained khaki green button identical to the buttons on field jackets issued at the state prison from which Cooper escaped was found on the rug. Tests revealed the presence of blood in the shower and bathroom sink of the Lease home, and hair found in the bathroom sink was consistent with that of Jessica and Doug Ryen. A bloodstained rope in the Lease house bedroom was similar to a bloodstained rope found on the Ryens' driveway. A hatchet covered with dried blood and human hair that was found near the Ryens' home was missing from the Lease house, and the sheath for the hatchet was found in the bedroom where Cooper stayed. Buck knives and at least one ice pick were also missing from the Lease home, though a strap from one buck knife was found on the floor.

---

**2.** A memorandum disposition was filed December 15, 2000. Upon review of Cooper's petition for rehearing, a majority of the panel voted to reconsider the disposition. Having reconsidered the issues, we vacate the disposition and replace it with this opinion, Judge Gould's concurring opinion, and Judge Browning's dissent. However, Part IV of this opinion is the same as Parts 4–7 of the disposition.

Blood found in the Ryens' home was the victims', except for one drop on a wall near where the murders occurred. It belonged to an African–American male, which Cooper is. Two partial shoe prints and one nearly complete shoe print found in the Ryens' house were consistent both with Cooper's size and the Pro Ked shoes issued at CIM.

The Ryens' vehicle, which had been parked outside their house, was missing when the bodies were discovered but was later found in Long Beach. A hand-rolled cigarette butt and "Role–Rite" tobacco that is provided to inmates at CIM (but not sold at retail) was in the car. Similar loose leaf tobacco was found in the bedroom of the Lease house where Cooper had stayed. A witness testified that Cooper smoked hand-rolled cigarettes using Role–Rite tobacco. A hair fragment discovered in the car was consistent with Cooper's pubic hair and a spot of blood found in the car could have come from one of the victims but not from Cooper.

Cooper was charged with four counts of first degree murder and one count of attempted murder in the first degree, and with escape from state prison. He pled guilty to escaping from state prison. On February 19, 1985, a jury convicted Cooper of the first degree murders of Franklyn Douglas Ryen, Jessica Ryen, Peggy Ann Ryen and Christopher Hughes, and of attempted murder in the first degree of Joshua Ryen. The jury also found true the special circumstance of multiple murders, as was the allegation that Cooper intentionally inflicted great bodily injury on Joshua Ryen. The jury then determined the penalty as death on the four murder counts. On May 6, 1991, the California Supreme Court affirmed the convictions and sentence. *See People v. Cooper,* 53

Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865 (1991). The United States Supreme Court denied a petition for writ of certiorari on December 16, 1991. *Cooper v. California,* 502 U.S. 1016, 112 S.Ct. 664, 116 L.Ed.2d 755 (1991).

Cooper filed his first federal petition for writ of habeas corpus on August 11, 1994, and an amended petition on April 12, 1996. Meanwhile, he returned to state court to exhaust a number of claims. On February 19, 1996, the California Supreme Court denied Cooper's state habeas petition. Cooper then filed a supplemental petition in district court on June 20, 1997. Following an evidentiary hearing, the petition was denied on August 25, 1997.[3]

Cooper timely appeals.

## II

■ Cooper argues that he was denied effective assistance of counsel when his trial attorney decided to forego lesser included offense instructions of second degree murder. He contends that this decision was based on his lawyer's erroneous belief that no first degree murder convictions were required to reach the penalty phase. A petitioner seeking habeas relief based on the ineffective assistance of counsel must show (1) that the counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability (*i.e.,* a probability sufficient to undermine confidence in the outcome) that but for the counsel's unprofessional errors the result of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

During a conference on jury instructions, Cooper's trial counsel, David Negus,

---

**3.** Cooper filed a second habeas petition on April 30, 1998, which was denied by the district court on June 15, 1998. Cooper has also appealed this ruling, but we address only the initial petition in this decision.

objected to the court's suggestion that it provide instructions on second degree murder. As he explained, "It's first degree or it is nothing." Negus informed the court that "Mr. Cooper and I both agreed that we don't want a second degree instruction. Correct?" and Cooper responded, "That's true." Negus asserted that he and Cooper realized that they were foreclosing the possibility of a potentially lesser conviction, but nevertheless did not want the jury to compromise on second degree murder. In any event, Negus said that he did not believe that the evidence supported a finding of second degree murder. Thereafter, the trial court requested a waiver from the defendant personally, which was obtained.

■ Cooper argues that Negus either misunderstood the law or deliberately misled his client when he caused Cooper to waive his right to second degree instructions by informing him that two second degree murder convictions resulted in a penalty phase. The district court, after a thorough evidentiary hearing, found that Negus's decision to forego second degree murder instructions was not based on any misinterpretation of the law, but was rather based upon counsel's sound and reasonable decision to avoid a compromise verdict and attempt to obtain a hung jury. However, because Cooper must prove both deficient performance and prejudice, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

[5] Cooper must "affirmatively prove prejudice." *Id.* at 693, 104 S.Ct. 2052. This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors *actually* prejudiced him. *See id.* Whether an error actually prejudiced a defendant is weighed against the "totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. 2052. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. 2052.

Here, even assuming error, there is no possibility that Cooper was actually prejudiced. As the California Supreme Court observed, and the district court also held:

If the jury found defendant was the killer, it necessarily would find he took the murder weapons, the hatchet and knife, with him from the Lease house. This showed planning prior to the killing. He has an obvious motive both for stealing the Ryen car—to get transportation away from the area—and for killing the family—to facilitate the theft and gain time to perfect his escape. To have argued for second degree murder verdicts might merely have undercut the credibility of the defense—which was that the investigation had been so badly botched the prosecution simply had the wrong person.

*Cooper,* 53 Cal.3d at 832, 281 Cal.Rptr. at 125, 809 P.2d 865.

The California Supreme Court further pointed out that the evidence suggested that the two children were killed after the parents. *Id.* As a result, even if the jury could have found second degree murder as to the parents, perhaps as a result of jury compromise, "it surely would have found the murders of the children to have been in thè first degree. This would have subjected defendant to the death penalty." *Id.*

In sum, overwhelming evidence indicated that Cooper, an escaped convict without transportation, entered the Ryens' house

with a hatchet and buck knife (both missing from the Lease house where he had stayed), murdered four people, including two children, and left another child nearly dead. Douglas Ryen had 37 separate wounds, Peggy Ryen had 32 separate wounds, Jessica Ryen had 46 separate wounds, and Chris Hughes had 25 separate wounds. The wounds came in three varieties: chopping wounds inflicted by a hatchet, stabbing wounds inflicted by a knife, and chest wounds on Jessica inflicted by an ice pick.[4] Cooper suggests that rational jurors could have returned a second degree murder verdict, but each case he offers in support is distinguishable.[5] Given the number and types of wounds inflicted on the four murder victims, together with the multiple wounds suffered by Josh Ryen, and the killing of the two children after the killing of the parents (which Cooper does not contest), it is not reasonably probable the jury would have returned *any* second degree murder conviction, let alone *four* of them.

Thus, Cooper has not shown that his trial counsel's decision to forego second

degree murder instructions prejudiced the outcome of his case. Likewise, as Cooper has failed to explain how the jury could have reasonably returned four second degree murder verdicts—the only result that could have avoided a penalty phase—he cannot escape the fact that whether or not the second degree murder instructions were given, he would have been subjected to a penalty phase and the death penalty.

### III

■ Relying on *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), Cooper contends that due process requires the jury in a capital case to be instructed on any lesser included offenses which are supported by the evidence. However, this argument is waived because it was not raised in his federal habeas petition. *See Belgarde v. Montana,* 123 F.3d 1210, 1216 (9th Cir.1997) ("Habeas claims that are not raised in the petition before the district court are not cognizable on appeal.").

---

**4.** As the California Supreme Court has made clear, "directly plunging a lethal weapon into the chest evidences a deliberate intention to kill." *See People v. Anderson,* 70 Cal.2d 15, 27, 73 Cal.Rptr. 550, 557, 447 P.2d 942 (1968).

**5.** For example, in *People v. Nunley,* 168 Cal. App.3d 225, 214 Cal.Rptr. 82 (1985), it was possible that the defendant may have shot his victims in self-defense, to frighten his victims into submission, or to disable them in order to make his escape. These theories are inapposite here given the different weapons used and the fact that three of the victims were children. In *People v. Anderson,* 38 Cal.3d 58, 62, 210 Cal.Rptr. 777, 780, 694 P.2d 1149 (1985), the defendant may have pulled the trigger as an instinctive reaction in defense of his person, but there is no reasonable possibility that Cooper inflicted some 150 wounds with three different weapons as an "instinctive reaction" in self-defense. Further, the selection of particular lethal instruments to

kill victims, instruments such as "a hammer, an ice pick, the blunt end of an axe, and a kitchen knife," show prior planning, and the infliction of deliberately placed blows with the intention that those blows result in death indicates a first degree murder. *See Anderson,* 70 Cal.2d at 29, 73 Cal.Rptr. at 558, 447 P.2d 942. Here, the wounds inflicted on the four murder victims were not intended merely to disable them: the dozens of severe wounds, inflicted quickly on each victim, were meant to kill. *See People v. Bolin,* 18 Cal.4th 297, 332, 75 Cal.Rptr.2d 412, 437, 956 P.2d 374 (1998) (finding first degree manner of killing where the forensic evidence indicated that the defendant did not want merely to wound the victims, but rather wanted to make certain they died). Finally, while Cooper points out that the keys were in the car, thereby undermining the motive ascribed to him by the California Supreme Court and the district court (facilitating theft of the Ryens' car and to gain time to perfect the escape), he produced no evidence that he knew this.

Cooper's federal habeas petition mentions *Beck* in ground XII (B), but this is not enough. Ground XII alleges that "Mr. Cooper received ineffective representation depriving him of his right to effective assistance of counsel, his right against cruel and unusual punishment, his right against self-incrimination, and his right to due process and to equal protection of the law under the United States Constitution." Subpart (B) sets forth his claim that "trial counsel's decision to forego an instruction on the lesser-included offenses undermined the reliability of the guilt and penalty verdicts." Cooper's cite to *Beck* and *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), in this connection was to show that counsel's position on foregoing second degree murder instructions fell below the standard of criminal defense lawyers, because rational jurors could have found murder in the second degree and should have been given that choice. The petition makes no free-standing claim that Cooper's due process rights under *Beck* were violated, although it asserts numerous grounds for trial court error of constitutional dimension—including instructional errors that allegedly deprived Cooper of due process. Because Cooper raised no

*Beck* claim before the district court apart from his claim that his counsel was ineffective, I would not consider a *Beck* claim now.[6]

## IV

We address the remaining issues that Cooper raises on appeal as we did in our earlier memorandum.

### A. State Procedural Bars

The California Supreme Court denied several of Cooper's state habeas claims based on a state procedural bar established in *In re Dixon*, 41 Cal.2d 756, 264 P.2d 513 (1953). The district court denied Cooper's claims on the merits and as an alternative held that *Dixon* was an independent and adequate state procedural bar to federal review. We have since held that *Dixon* was not firmly established and consistently applied at least prior to 1993, *see Fields v. Calderon*, 125 F.3d 757, 765 (9th Cir.1997), and the state concedes that *Dixon* therefore cannot constitute an independent and adequate state procedural bar. However, Cooper failed to discuss the merits of any of the claims that were held procedurally barred. We will not here

**6.** Although I do not believe the *Beck* due process claim is preserved, I agree with Judge Gould that if it were, it fails for lack of prejudicial error.

In any event, I disagree with the dissent that *Beck* requires reversal on the merits. The state statute in *Beck* precluded a second degree murder instruction, leaving the defendant there with no choice (unlike here); *Beck* was essentially given the death penalty by operation of law in the guilt phase. *See Hopkins v. Reeves*, 524 U.S. 88, 94–100, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998) (distinguishing *Beck*). A defendant's right to a second degree instruction is waivable, *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), and Cooper chose to waive it and go for broke. As the Supreme Court explained:

Although the Beck rule rests on the premise that a lesser included offense instruction in a capital case is of benefit to the defendant, there may well be cases in which the defendant will be confident enough that the State has not proved capital murder that he will want to take his chances with the jury. If so, we see little reason to require him ... to give the State ... an opportunity to convict him of a lesser offense if it fails to persuade the jury that he is guilty of capital murder. In this case, petitioner was given a choice whether to waive the statute of limitations on the lesser offenses included in capital murder. He knowingly chose not to do so. Under those circumstances, it was not error for the trial judge to refuse to instruct the jury on the lesser included offenses.

*Id.* at 456–57, 104 S.Ct. 3154 (footnote omitted).

consider claims that were not raised in the appellant's opening brief. *See Miller v. Fairchild Indus., Inc.,* 797 F.2d 727, 738 (9th Cir.1986).

### B. Denial of Additional Funding for Habeas Counsel

■ We will reverse the district court's denial of funds only if Cooper: (1) establishes that reasonably competent retained counsel would require such services for a client who could pay for them; and (2) demonstrates by clear and convincing evidence that the defense was prejudiced by the lack of further investigation. *See Bonin v. Calderon,* 59 F.3d 815, 837 (9th Cir.1995). Even assuming reasonably competent retained counsel would have reviewed the entire record, Cooper cannot show prejudice.

At the time the district court's orders of January 14, 1997 and April 8, 1997 denying funds were entered, a stay on the federal proceedings was in effect. Ten days after the second denial, the stay was lifted. Just twelve days after that, the district court issued an order granting significant additional funding for 520 hours of attorney work and extensive investigative and expert services. Cooper has not explained why this additional grant was insufficient to allow his counsel to review the entire remaining record in the case. He has also failed to show that he was prejudiced by the district court's decision to wait for the federal stay to be lifted before it authorized additional funds. Because Cooper cannot show prejudice by clear and convincing evidence, his funding claim fails.

### C. Deputizing Officer as Second Bailiff

■ The trial court deputized Sergeant Bill Arthur, the chief investigating officer in the Ryen–Hughes murders and a witness at trial, to serve as a second bailiff during the jury's visit to the crime scene. Arthur sat at the prosecution table throughout Cooper's trial. Cooper's trial counsel called Arthur as a defense witness to support the defense's theory that police officers botched the investigation. On the witness stand, Arthur acknowledged his bias toward the prosecution and his desire to obtain a conviction.

Later in the trial, the court swore in Sergeant Arthur and the bailiff to guide the jurors during a visit to the Ryen and Lease houses. The court informed the jury that Arthur and the bailiff were not to talk with the jurors. Cooper's counsel did not object to Arthur's role in the visit. At the conclusion of the visit, the judge invited the attorneys to state "if there's anything you wanted to put on the record or any untoward things that occurred." Cooper's counsel made no objections.

In *Turner v. Louisiana,* 379 U.S. 466, 467–68, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), two principal witnesses for the prosecution, both deputy sheriffs, served as bailiffs for a sequestered jury throughout a three-day trial. They and other deputy sheriffs drove the jurors to a restaurant for each meal, drove them to their lodgings at night, ate with the jurors, conversed with them, and did errands for them. *See id.* at 468, 85 S.Ct. 546. An evidentiary hearing confirmed that they "freely mingled and conversed with the jurors in and out of the courthouse during the trial," although there was no evidence that they discussed the case with the jurors. *Id.* at 468–69, 85 S.Ct. 546. The defendant objected and moved for a mistrial, but his motion was denied. *See id.* at 468, 85 S.Ct. 546.

The Supreme Court held that the defendant had been denied his Sixth Amendment right to an impartial jury. *See id.* at 471–72, 85 S.Ct. 546. The Court found the jury's contacts with the deputies outside the courtroom may have influenced the jury's credibility assessment of the deputy's testimony, which was crucial to the

prosecution's case. *See id.* at 473, 85 S.Ct. 546. "[E]ven if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution." *Id.*

In this case, the circumstances of Arthur's contact with the jury were considerably different from the contacts in *Turner.* First, Arthur was never alone with the jury. The judge and attorneys were always present. He was not singled out as "trustworthy" to enter the private realm of the jury room during deliberations. *See United States v. Pittman,* 449 F.2d 1284, 1286 (9th Cir.1971) (per curiam) (applying *Turner*). Both the judge and defense counsel were present to observe any inappropriate contacts between Arthur and the jurors. Second, the judge specifically instructed Arthur and the jurors not to discuss the case during the visit. Third, the contact was not continuous throughout the trial, but was limited to one day. Fourth, defense counsel did not object to the use of Arthur in this manner. In light of these factors, the record does not establish sufficient contact to constitute a due process violation.

### D. Destruction of Bloody Overalls

■ On June 9, the day police charged Cooper with committing the murders, Diana Roper turned over to Deputy Sheriff Eckley a pair of overalls that appeared to be splattered with blood, and told police that she had reason to believe the overalls had been worn by a person involved in the Ryen–Hughes murders. Eckley took possession of the overalls and informed the Ryen homicide investigators about the discovery, but they never responded to his message. Eckley destroyed the overalls after holding them for about six months, following what he claimed was department policy.

The state trial court held a lengthy pretrial evidentiary hearing and concluded that all law enforcement officials acted in good faith and that there was no destruction of material evidence. *See Cooper,* 53 Cal.3d at 810, 281 Cal.Rptr. at 110, 809 P.2d 865. The court declined to impose any sanction on the prosecution, but permitted Cooper to raise the issue at trial. *See id.* at 810–12, 281 Cal.Rptr. at 111–12, 809 P.2d 865. Cooper did so, calling Eckley as a witness and examining him about the circumstances of his receipt and destruction of the bloody overalls.

The California Supreme Court affirmed the trial court, holding that "[n]othing in the record suggests that any additional evidence would have been exculpatory, or that any exculpatory value was apparent at the time any evidence was lost. Defendant has also failed to show bad faith." *Id.* at 811, 281 Cal.Rptr. at 111, 809 P.2d 865 (citation omitted). On federal habeas review, the district court found that "nothing in the record suggests that these coveralls had any exculpatory value at the time they were destroyed.... As petitioner has [also] failed to show any factual basis for his bad faith claims against either the district attorney or the Sheriff, this court finds his claims to be without merit."

■ In *Grisby v. Blodgett,* 130 F.3d 365 (9th Cir.1997), this court summarized the standards for reviewing claims related to police destruction of evidence:

> The duty to preserve evidence is limited to material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and that is of such nature that the defendant cannot obtain comparable evidence from other sources. *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). "[U]nless a criminal defendant can show bad faith on the part of the police, fail-

ure to preserve potentially useful evidence does not constitute a denial of due process of law."

*Id.* at 371 (quoting *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)).

Under pre-AEDPA law, state court findings of fact made after a hearing are presumed to be correct unless one of eight statutory exceptions apply. *See* 28 U.S.C. § 2254(d) (1994). Cooper does not argue that any of these statutory exceptions applies, nor does he in any way challenge the adequacy of the state hearing.

In light of the preclusive effect of the state trial court's findings, which Cooper does not challenge, we must reject this claim. The trial court found that the bloody evidence was not exculpatory; therefore, Cooper can prevail only if he demonstrates that the police acted in bad faith by destroying them. But the trial court also found that the police did not act in bad faith. We therefore reject Cooper's claim.

AFFIRMED.

GOULD, Circuit Judge, concurring:

I concur in Parts I, II, and IV of Judge Rymer's opinion and in the judgment of the court. I decline to join Part III of the opinion, primarily because I conclude that Cooper adequately raised the *Beck* due process claim in his petition. Nonetheless, Cooper did not establish prejudice, and the *Beck* due process claim does not require a grant of the petition.

 Cooper adequately raised in his habeas corpus petition, ground XII(B), the claim that, under *Beck,* Cooper's due pro-

cess rights were violated when the trial judge failed *sua sponte* to instruct the jury on the lesser-included offenses of second degree murder. Cooper disjunctively but explicitly raised the issue of the *Beck* due process claim in his petition. After citing *Beck* and *Hopper* to support his claim that his trial counsel was ineffective for rejecting instructions to the jury on lesser-included offenses, Cooper also explicitly contended in his petition: "For the same reasons noted in the preceding argument, either the trial court had a *sua sponte* duty, or, in the alternative, trial counsel was ineffective." This express claim that the trial court had a duty *sua sponte* to instruct on second degree murder is sufficient in my view to permit our review of the *Beck* due process claim.

 Reaching the merits, I conclude that Cooper cannot show that he was prejudiced by the lack of jury instruction on second degree murder.[1] In habeas cases, we review prejudice resulting from constitutional error by determining whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See Gerlaugh v. Stewart,* 129 F.3d 1027, 1031 (9th Cir.1997) (applying *Brecht* prejudice standard to capital habeas corpus case).

The *Brecht* standard by its terms focuses on an injurious effect on the jury's verdict. Here, the evidence more than strongly supports four first degree murder convictions, for all of the deaths, even if the jury was instructed on second degree murder: Cooper brought the murder

---

1. Because Cooper cannot establish prejudice, I need not consider and do not reach the issue whether *Beck* 's due process protection is applicable where, as here, the jury maintains discretion to return a life sentence in a penalty phase. For the same reason, I also do not decide: (1) whether Cooper knowingly waived his right to a second degree murder instruction as part of a trial strategy or whether his waiver was based on counsel's erroneous interpretation of California law; and (2) the possible implications the resolution of this factual issue would have on the applicability of *Beck* here.

weapons to the Ryens' home, there were four victims killed over a prolonged killing spree, and each victim suffered a great number of brutal wounds. But even if the jury could reasonably have convicted Cooper of only second degree murder on the first two murders, those of the adults, in my opinion there is no possibility that a jury reasonably could have returned second degree murder convictions for the subsequent murder of the two children.

The evidence paints unmistakably this gruesome picture: Cooper brought multiple murder instruments to the Ryens' home (a hatchet or an axe, and a knife). There was an interval between the murders. The children, Jessica Ryen and Christopher Hughes, were killed after the adults, Douglas Ryen and Peggy Ryen, were killed. Multiple wounds were inflicted on the murdered children (46 wounds for Jessica Ryen, including additional wounds inflicted by an ice pick, and 26 wounds for Christopher Hughes). This evidence taken together demonstrates unmistakably that there was heartless premeditation for the killing of the children. Given the overwhelming evidence of first degree murder of the children, no reasonable jury could have convicted Cooper of four second degree murders.[2] *See Gerlaugh*, 129 F.3d at 1031 (finding the *Brecht* prejudice standard was not met because the evidence against the defendant was overwhelming). With two first degree murder convictions, the penalty phase was inescapable under California law. Even if *Beck*'s due process concerns would permit us to consider the penalty phase, I do not believe that one or two second degree murder convictions, in the context of this horrific crime, could conceivably have led a penalty phase jury to impose anything short of the death penalty. Cooper cannot establish prejudice. I fully concur in the judgment.

BROWNING, Circuit Judge, dissenting:

I dissent. I agree with Judge Gould that Cooper adequately raised a claim of constitutional error under *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). I also believe the error may have had a substantial and injurious effect in determining the jury's verdict within the meaning of *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), and Cooper should be granted relief.

The Supreme Court held in *Beck* that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." 447 U.S. at 637, 100 S.Ct. 2382. The Court held such a risk to be intolerable in a death penalty case. *Id.*

The purpose of the *Beck* rule is not to afford special protection to either the defendant or the prosecution, but to protect the integrity of the jury's fact-finding role and its deliberative process, recognizing that especially in a death penalty case, the reliability of the guilt determination is of crucial importance. Cases applying *Beck* reaffirm this rationale. *See Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (*Beck* rule's goal is "to eliminate the distortion of the factfind-

---

**2.** Although the *Strickland* "reasonable probability" standard for prejudice for ineffective assistance of counsel differs from the *Brecht* "substantial and injurious effect" standard appropriate for a *Beck* due process claim, both standards focus on assessing the effect constitutional error had on the jury's verdict. Here, because of the overwhelming nature of the evidence, Cooper cannot establish prejudice under either of these standards.

ing process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."); *Schad v. Arizona,* 501 U.S. 624, 646, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) ("Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all."); *Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (*Beck* rule ensures the "jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence.").

The Court's conclusion in *Beck* rested heavily on the fact that "[d]eath is a different kind of punishment from any other which may be imposed in this country." *Beck,* 447 U.S. at 637, 100 S.Ct. 2382 (*citing Gardner v. Florida,* 430 U.S. 349, 357–58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977)). When the defendant's life is at stake, the *Beck* rule attempts to ensure the guilt determination is based not on the choice between convicting the defendant of a capital offense or "letting him off," but rather on whether the state has proved every element of the crime beyond a reasonable doubt. As the Supreme Court noted, a jury convinced that the defendant is guilty of some crime, but unsure whether he is guilty of the charged crime, is likely to resolve its doubts in favor of conviction. *Keeble v. United States,* 412 U.S. 205, 212–13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). When death is the penalty, the price of this kind of compromise is unacceptably high.

Cooper's jury was presented with only two options. It could either convict Cooper of first degree murder and attempted first degree murder, which would mandate a penalty phase and the possible imposition of the death penalty, or it could acquit Cooper and set him free. Given the facts of the case and the prosecution's theory that Cooper acted alone, if the jury thought Cooper was guilty of some crime and should be punished, its only real choice was to convict him of the capital offense of four first degree murders and one attempted first degree murder. The fact that the jury deliberated seven days before returning the guilty verdict suggests it harbored serious doubts about whether the state had proved the elements of four first degree murders beyond a reasonable doubt. It is not difficult to believe the jury may have resolved its doubts exactly as the Supreme Court in *Keeble* feared—in favor of conviction. The dilemma presented here cannot be distinguished from that presented in *Beck.* The *Beck* rule should be applied.[1]

---

1. Cooper's "waiver" of second degree murder instructions should not bar consideration of his claim. In *Spaziano v. Florida,* the Supreme Court held that the defendant should be given the choice of whether he wants "the benefit of the lesser included offense instruction[s]." 468 U.S. at 447, 104 S.Ct. 3154. But this rule has no application where the validity of the defendant's waiver is in doubt. Unlike in *Spaziano,* the record here does not demonstrate that the defendant "knowingly chose" to waive instructions on the lesser offenses. Cooper's attorney solicited his waiver by stating that "if you find two second degrees, then we're into the penalty phase," a patently incorrect representation of California law. We should not refuse to apply the *Beck* rule on the basis of a defendant's unknowing waiver, solicited through a plainly incorrect statement of the law.

*Beck* is not distinguishable because the jury in Cooper's case retained the discretion to sentence him to life imprisonment rather than to death. *See Hooks v. Ward,* 184 F.3d 1206, 1227 (10th Cir.1999). In the *Beck* case itself, the judge retained discretion to review the jury's sentence of death to decide whether to change the sentence to life imprisonment. 447 U.S. at 629, 100 S.Ct. 2382. Similarly, in *Spaziano,* the jury was permitted to and did,

The proper inquiry is whether the evidence would have supported second degree murder instructions. *Hopper*, 456 U.S. at 611, 102 S.Ct. 2049. As the majority points out, considerable evidence of premeditation and deliberation was presented at Cooper's trial. The evidence is not so conclusive, however, as to "affirmatively negate" the possibility that Cooper could have been convicted of second degree murder on at least one count. *See id.* at 613, 102 S.Ct. 2049; *see also Vickers v. Ricketts*, 798 F.2d 369, 373 (9th Cir.1986) (second degree instructions warranted even when there was "abundant, clear and persuasive evidence of premeditation" and "evidence of lack of premeditation was not compelling.").

Although the evidence did strongly suggest that Cooper brought the hatchet and buck knives, and perhaps other tools, to the Ryen house, the jury could have concluded that the prosecution failed to prove Cooper intended to use those tools as murder weapons. The jury could also have concluded that the prosecution failed to prove Cooper had a motive for murdering the Ryen family. The prosecution did not suggest a motive in its closing argument and there was no evidence of a prior relationship between Cooper and the family. Even if the jury considered theft the possible motive, it could have doubted the likelihood of this motive. The car keys were left in the Ryen cars, the house was not ransacked, and several valuable items of property in plain view in the house were left undisturbed. Finally, the jury could have concluded that the manner of killing, a brutal hatcheting of five people, which experts testified could have taken less than one minute per victim, suggested an explosion of rage rather than a deliberate execution.[2] Under *Beck*, therefore, I believe the trial court was required to instruct the jury on the lesser included offense of second degree murder and that it committed constitutional error in failing to do so.

The error had a "substantial and injurious effect or influence in determining the jury's verdict." The analysis of "substantial and injurious effect" under *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), differs from the analysis of prejudice in an ineffective assistance of counsel claim. In determining prejudice in an ineffective assistance of counsel claim, the inquiry is whether there is "reasonable probability that, but for counsel's unprofessional errors, the *result* of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (emphasis added). In contrast, under *Brecht*'s substantial and injurious effect standard, which the Court borrowed explicitly from its earlier decision in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946):

> [T]he question is, not were [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had

in fact, sentence the defendant to life in prison. 468 U.S. at 451–52, 104 S.Ct. 3154. The defendant was sentenced to death only after the judge overrode the jury's determination. *Id.* at 452, 104 S.Ct. 3154. In *Schad*, the Court considered the merits of the defendant's *Beck* claim despite the fact that his death sentence was not automatically tied to his conviction by the jury. 501 U.S. at 629, 111 S.Ct. 2491. As these examples demonstrate, *Beck* applies even though the sentencing body retains discretion to sentence defendant either to death or life imprisonment.

**2.** This conclusion would be entirely consistent with the prosecutor's closing argument, in which he offered the following description of the crime: "It is a crime involving the frustrated lashing out, the exhibition of anger that virtually knows no bounds. There is no explanation. There can be no explanation for such a crime."

upon the jury's decision.... The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

· *Id.* at 764–65, 66 S.Ct. 1239; *Whelchel v. Washington,* 232 F.3d 1197, 1206 (9th Cir. 2000).[3] The *Brecht* standard looks to the effect of the error on the minds of the jurors during their deliberations, rather than to the effect of the error on the outcome of those deliberations. *See Kotteakos,* 328 U.S. at 764, 66 S.Ct. 1239 ("The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.").

In addition to being different in kind, the Supreme Court has specifically characterized the *Kotteakos/Brecht* harmlessness standard as lower in quantum of required proof than the *Strickland* prejudice standard. In *Kyles v. Whitley,* 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court noted that the test for prejudice under *Strickland* "would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under *Kotteakos.*"

Applying this standard, it is impossible to say that the lesser included instructions would not have had a substantial effect on the jury's deliberation and ultimate decision. The jury deliberated seven days before returning the guilty verdicts. The jury's deliberative process might well have been significantly affected if it had been permitted to consider convicting Cooper of the lesser offense. As suggested above, the evidence of premeditation and deliberation was not so conclusive that the jury could not have found that the state failed to prove prior planning and motive beyond a reasonable doubt. At the very least, it cannot be said "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." · *Coleman v. Calderon,* 210 F.3d 1047, 1051 (9th Cir.2000) (*citing Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239). Accordingly, I believe we should grant Cooper relief on this claim.

---

**3.** The concurrence ignores the distinction between the harmlessness inquiries under *Strickland* and *Brecht* and thus focuses improperly, I believe, on the question of whether the death penalty would nevertheless have been imposed had Cooper's jury been instructed on second degree murder. The proper question is not whether second degree instructions might have altered the outcome of Cooper's trial with respect to the necessity of the penalty phase and the eventual imposition of the death penalty, but whether the failure to give lesser included instructions had a substantial or injurious effect on the jury's deliberative process and verdict.