357 F.3d 1019
 KEVIN COOPER, Petitioner,
v.
JEANNE WOODFORD, Warden, San Quentin State Prison, San Quentin, California, Respondent.
 No. 04-70578.
 United States Court of Appeals, Ninth Circuit.
 Filed February 8, 2004.
 
 David T. Alexander, George Alan Yuhas, Lisa Marie Schull, Orrick, Herrington & Sutcliffe, LLP, San Francisco, CA, for Petitioner.
 Holly D. Wilkens, AGCA-Office of the California Attorney General, San Diego, CA, for Respondent.
 Before: James R. Browning, Pamela Ann Rymer, and Ronald M. Gould, Circuit Judges.
 
 
 1
 Order; Dissent by Judge Browning.
 
 ORDER
 
 2
 Kevin Cooper, a California death row inmate whose execution is scheduled for Tuesday, February 10, 2004 at 12:01 a.m., has filed an application to file a successor petition for writ of habeas corpus under 28 U.S.C. § 2244(b)(3), and a request for stay of execution. His request for an order authorizing the district court to consider this petition — his third application in the federal system following denial of his original habeas petition — is premised on the existence of evidence with respect to a blood spot, cigarette butts, and shoe print impressions that he asserts was manufactured by the state and which, if known to the jury, would have weakened the links in the state's chain of circumstantial evidence. He asks for another chance affirmatively to demonstrate his innocence through available mitochondrial DNA testing of hairs found in one of the victim's hands, and testing for the presence of a preservative agent EDTA on a T-shirt. However, with immaterial exceptions, this application turns on facts that have long since been known and that have already been presented and resolved adversely to Cooper in state court evidentiary hearings, proceedings before the California Supreme Court on direct and collateral review, in his original habeas petition in federal court, and in connection with his applications in this court to file second or successive petitions. To the extent that the claims are formulated differently in the petition he now asks to file, they are nevertheless based on facts that were available and could previously have been discovered with the exercise of due diligence. For this reason, Cooper fails to make the showing that the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) requires for approval of his application. 28 U.S.C. § 2244(b)(3)(C).
 
 
 3
 In addition, Cooper's petition does not set forth facts that are sufficient to show by clear and convincing evidence that, in light of the evidence as a whole, no reasonable factfinder would have found him guilty of the offenses charged. The few items of evidence upon which Cooper now relies that were not before the jury have little or no probative value and fall short of showing that it is more likely than not that no reasonable juror would have convicted him.
 
 
 4
 Cooper has made no showing of actual innocence, nor has he shown that it would be manifestly unjust for the courts to decline to revisit the same issues again. Accordingly, we deny the application to file this successive petition. Given this decision, there is no basis for granting a stay.
 
 
 5
 * On June 2, 1983, Cooper escaped from the California Institute for Men (CIM), a state prison.[1] He admitted that he stayed in a vacant house (the Lease house) next door to the Ryens' residence on Thursday night, all day Friday, and Friday night; he hid in the bathroom when one of the owners of the Lease house stopped by on Saturday morning. The murders happened Saturday night. Using a hatchet or axe and a knife, he hacked to death Douglas and Peggy Ryen (37 separate wounds for Douglas, 32 for Peggy), their ten-year-old-daughter Jessica (46 wounds), and eleven-year-old Christopher Hughes (26 wounds), who was spending the night at the Ryens' home. Cooper also inflicted chopping wounds to the head, and stabbing wounds to the throat, of eight-year-old Joshua Ryen, who survived.
 
 
 6
 At the Lease house, a blood-stained khaki green button identical to the buttons on field jackets issued at the state prison from which Cooper escaped was found on the rug. Tests revealed the presence of blood in the shower and bathroom sink of the Lease home, and hair found in the bathroom sink was consistent with that of Jessica and Doug Ryen. A bloodstained rope in the Lease house bedroom was similar to a bloodstained rope found on the Ryens' driveway. A hatchet covered with dried blood and human hair that was found near the Ryens' home was missing from the Lease house, and the sheath for the hatchet was found in the bedroom where Cooper stayed. Buck knives and at least one ice pick were also missing from the Lease home, though a strap from one buck knife was found on the floor.
 
 
 7
 Blood found in the Ryens' home was the victims', except for one drop on a wall near where the murders occurred. It belonged to an African-American male, which Cooper is. Two partial shoe prints and one nearly complete shoe print found in the Ryens' house were consistent both with Cooper's size and the Pro Keds shoes issued at CIM.
 
 
 8
 The Ryens' vehicle, which had been parked outside their house, was missing when the bodies were discovered but was later found in Long Beach. A hand-rolled cigarette butt and "Role-Rite" tobacco that is provided to inmates at CIM (but not sold at retail) was in the car. Similar loose leaf tobacco was found in the bedroom of the Lease house where Cooper had stayed. A witness testified that Cooper smoked hand-rolled cigarettes using Role-Rite tobacco. A hair fragment discovered in the car was consistent with Cooper's pubic hair and a spot of blood found in the car could have come from one of the victims but not from Cooper.
 
 
 9
 Cooper was charged with four counts of first degree murder and one count of attempted murder in the first degree, and with escape from state prison. He pled guilty to escaping from state prison. On February 19, 1985, a jury convicted Cooper of the first degree murders of Franklyn Douglas Ryen, Jessica Ryen, Peggy Ann Ryen and Christopher Hughes, and of attempted murder in the first degree of Joshua Ryen. The jury found true the special circumstance of multiple murders, which made Cooper death-eligible under California's sentencing scheme. The jury also found true the special circumstance that Cooper intentionally inflicted great bodily injury on Joshua Ryen. The jury then determined the penalty as death on the four murder counts. On May 6, 1991, the California Supreme Court affirmed the convictions and sentence. See People v. Cooper, 53 Cal.3d 771, 281 Cal.Rptr. 90 (1991). The United States Supreme Court denied a petition for writ of certiorari on December 16, 1991. Cooper v. California, 502 U.S. 1016 (1991).
 
 
 10
 On March 24, 1992 Cooper requested appointment of counsel and a stay of execution from the United States District Court for the Southern District of California. He then filed a petition for writ of habeas corpus in the district court on August 11, 1994, and an amended petition on April 12, 1996. Meanwhile, he returned to state court to exhaust a number of claims. On February 19, 1996, the California Supreme Court denied Cooper's state habeas petition. Cooper then filed a supplemental petition in district court on June 20, 1997. Following an evidentiary hearing, the petition was denied on August 25, 1997. We affirmed in Cooper v. Calderon, 255 F.3d 1104 (9th Cir. 2001), and Cooper's petition for a writ of certiorari was denied by the United States Supreme Court. 537 U.S. 861 (2002). Cooper filed numerous additional papers in state court, and another federal petition for writ of habeas corpus on April 20, 1998. We treated his appeal from the district court's denial of that petition as an application for authorization to file a second or successive petition for writ of habeas corpus based on trial counsel's ineffective assistance with respect to the Koon confession, which we denied. Cooper v. Calderon, 274 F.3d 1270 (9th Cir. 2001). Cooper then filed a request to file another successor petition that involved DNA testing and tampering, which we also denied; Cooper v. Calderon, No. 99-71430 (9th Cir. Feb. 14, 2003, Apr. 7, 2003) (orders).
 
 
 11
 Cooper has filed six writs of habeas corpus in the California Supreme Court, the most recent of which was filed on February 2, 2004 and denied February 5, 2004. The petition before the California Supreme Court raised similar claims to those asserted in this application (actual innocence, tampering with evidence, failure to disclose exculpatory evidence, offering unreliable eye witness testimony of Joshua Ryen, denying Cooper the effective assistance of counsel during post-conviction DNA proceedings, and refusal of the state superior court to accept his petition for filing). The supreme court denied all claims on the merits and also denied those having to do with evidence tampering, failure to disclose exculpatory evidence/submission of false testimony to the jury, and offering Ryen's unreliable testimony as untimely, In re Robbins, 18 Cal.4th 770, 780 (1998).
 
 II
 
 12
 Cooper's application is governed by AEDPA. Under AEDPA, in order for us to grant Cooper's application to file a successive petition, he must present a claim that was not previously presented in a federal habeas petition, and that relies on either a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court, or a factual predicate which could not have been discovered through due diligence and that would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of the offense. 28 U.S.C. § 2244(b)(1), 2244(b)(2). We must decide whether his application makes a prima facie showing that satisfies these requirements. 28 U.S.C. § 2244(b)(3)(C).
 
 
 13
 Cooper argues that he has satisfied these prerequisites because evidence that he says is newly discovered through DNA proceedings, including evidence of false statements by the criminalist and continuing attempts to prevent Cooper from proving his innocence, provide factual predicates for compelling constitutional claims. As we will explain, findings by the state trial court after an evidentiary hearing are directly to the contrary. Cooper further contends that the evidence as a whole, including a confession by Kevin Koon, establishes by clear and convincing evidence that, but for the state's treachery, no reasonable factfinder would have been led to find Cooper guilty. As we will also explain, the district court found that the Koon confession would have had no effect on the outcome of the trial, and this court denied Cooper's request to file a second or successive petition on the same issue.
 
 
 14
 Further, Cooper submits that a claim is not subject to the requirements of § 2244(b) when the events that give rise to the claim occurred after resolution of the prior habeas petition. For this he relies on Stewart v. Martinez-Villareal, 523 U.S. 637, 644-45 (1998), and Hill v. State of Alaska, 297 F.3d 895, 898-99 (9th Cir. 2002). These cases are not helpful, however, because both involved issues such as competence to be executed that could not have been included in an earlier petition.
 
 
 15
 Finally, Cooper maintains that the requirements of § 2244(b)(2) need not be satisfied for a second or successive habeas corpus application to be considered by the district court because actual innocence is a constitutional safety valve. See Schlup v. Delo, 513 U.S. 298 (1995); Herrera v. Collins, 506 U.S. 390 (1993); McCleskey v. Zant, 499 U.S. 467 (1991). We do not decide in this case whether or not this is so, because as we shall explain, Cooper has neither affirmatively proven actual innocence nor shown that it is more likely than not that, in light of all the evidence, including reliable new evidence of actual innocence, no reasonable juror would have found him guilty beyond a reasonable doubt. See Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1997) (adopting this standard).
 
 III
 
 16
 The petition that Cooper asks for leave to file asserts nine claims. We consider them in turn.
 
 
 17
 Actual innocence (claim one). Cooper's application repeats his theory of defense — that he did not commit the murders and the prosecution provided no motive. He relies on evidence, or the lack of it, that he also relied upon at trial or presented in his first federal habeas petition and applications for second or successive petitions: that Joshua Ryen referred to several assailants and said he had never seen Cooper before; that three suspicious men were observed in the vicinity of the murders on the night they occurred; that the number of weapons used indicates multiple assailants were involved; that law enforcement ignored information about other possible suspects, in particular Diana Roper's that Lee Furrow (her boyfriend) may have participated in the murders and left "bloody" coveralls in her closet; that the police destroyed the coveralls; that the state ignored a purported confession by Kevin Koon; and that cigarette butts were tampered with. All of this, except perhaps for the cigarette butts (which we consider in connection with the second claim), has been known since the time of trial, but regardless, does not show that Cooper is probably innocent.
 
 
 18
 Evidence that Joshua Ryen said that three strangers had been at the house earlier looking for work and at one point said that he believed they may have been involved was before the jury. It lacks probative force given that he also testified that he only saw one person in the house when the murders occurred. Other people could have been at the house, too, yet Cooper's innocence would not be shown because his blood was on the wall and strong circumstantial evidence connected him with the house and the Ryens' car. Cooper's reliance on the Roper evidence is misplaced, because that evidence would show that Roper had a "vision" that the coveralls might have some importance to the Ryen murders, and that the law enforcement official to whom the coveralls were given believed they looked stained but not blood-stained. That officer testified at an evidentiary hearing in state court that the coveralls had hair, sweat, dirt, and manure on them. He testified similarly at trial. Thus, the evidence was considered by the jury. In addition, both the state trial court after an evidentiary hearing, and the district court on Cooper's first habeas petition, determined that the coveralls had no exculpatory value at the time they were destroyed and that there was no factual basis for finding any bad faith on the part of the prosecutor or sheriff. The first federal petition likewise resolved that the Koon "confession" was not material. Another inmate (Anthony Wisely) told officers that Koon confessed, but Koon himself said that he had not. It is not more likely than not that no reasonable juror would have found Cooper guilty based on this.
 
 
 19
 Cooper points to one piece of evidence that is newly discovered, that an inmate at the Chino Institute for Men where Cooper was incarcerated before his escape recanted (on January 8, 2004) his trial testimony that he gave Cooper a pair of Pro Keds tennis shoes shortly before Cooper escaped. Even if the inmate's recantation could not have been discovered previously through the exercise of due diligence, this evidence alone lacks clear and convincing force and is not sufficient to show that no reasonable factfinder would have found Cooper guilty if this fact had been known. The same applies to Cooper's claim that evidence exists that Pro Keds shoes were also available to the military and were not special-issue to CIM. The reason is that no matter what the source of the shoes, the same print impression was found outside the Ryen master bedroom, on a sheet on the Ryen bedroom waterbed, and in the game room of the Lease house. This connected Cooper, who stayed in the Lease house, to the scene of the crime. Considered in light of all the evidence, the newly discovered recantation would not be sufficient to establish that no reasonable juror would have found Cooper guilty.
 
 
 20
 Cooper's successive petition also alleges that his innocence would be manifest by mitochondrial DNA testing on blond hair clutched by one of the victims and EDTA testing on a bloody T-shirt, and would have been manifest but for mishandling of Exhibit A-41 (the blood spot found in the hallway of the Ryens' home), cigarette butts from the Ryen car and the Lease house, and a shoe impression. Information about how the exhibits were treated and tested is not newly discovered. Dr. Gregonis, the criminalist who analyzed the blood spot (Exhibit A-41), was extensively cross-examined at trial about his analysis and about the fact that he had changed his original analysis. The trial court found after an evidentiary hearing that all tests had been conducted in good faith. The post-conviction DNA testing claims were also before us, and resolved, in connection with Cooper's application for a second and successive petition. That application (in Case No. 99-71430) and Cooper's request for us to reconsider our denial of it, which we treated as if it were a new application, were based on DNA testing, asserted deficiencies in the testing process, and tampering. We concluded that there was no basis for a petition based on any of these claims. Cooper v. Calderon, Case No. 99-71430 (9th Cir. Feb. 14, 2003) (noting that DNA tests to which the state and Cooper agreed are not exculpatory and denying motion to file a second habeas corpus petition as Cooper failed to present newly discovered facts establishing his innocence); Cooper v. Calderon, Case No. 99-71430 (9th Cir. Apr. 7, 2003) (order denying Cooper's petition for rehearing that was based on asserted deficiencies in the testing and tampering). These issues may not be revisited. 28 U.S.C. § 2244(b)(1).
 
 
 21
 In addition, there was a three-day evidentiary hearing in June 2003 with respect to whether further mitochondrial testing was warranted on the hairs in the victims' hands, and whether law enforcement personnel tampered with or contaminated the evidence that was analyzed using nuclear DNA testing. The trial court found that Cooper had not shown that mtDNA testing of the hairs recovered from the victims' hands was material to the identity of the perpetrator, and that even if the results were favorable to him, it would not create a reasonable probability that a different verdict would have been returned by the jury. The trial court also found that Gregonis (and other San Bernardino officials) credibly testified as to the chain of custody of the evidence in question, that Gregonis did not contaminate or tamper with any piece of evidence, and that Cooper made no showing that law enforcement personnel tampered with or contaminated any evidence in his case. Order Denying Motion For Mitochondrial DNA Testing, Claim of Evidence Tampering, and Request for Post-Conviction Discovery, Case No. CR 72787 (Superior Court of the State of California in and for the County of San Diego, July 2, 2003). These findings are presumptively correct, 28 U.S.C. § 2254(e)(1), and no clear and convincing evidence alleged by Cooper rebuts them.[2]
 
 
 22
 Evidence tampering, destruction, and withholding (claim two). Cooper argues that the heart of his claim is that the state at trial, and through today, continues a pattern of deception and manipulation of evidence, inept and corrupt practices, and concealing official misconduct. In particular, he faults the work of criminalist Daniel Gregonis about most of which, as his application notes, the courts are well aware. The application points to newer evidence that Gregonis and Department of Justice criminalist Myers mishandled and contaminated evidence in 1999 and thereafter in connection with DNA testing, that Gregonis tampered with Exhibit A-41, that the state failed to deal with other blood samples in the vicinity of Exhibit A-41, that cigarette butts were mishandled, that evidence (such as the footprint, and sheath) were planted, and that leads were not pursued. The application also asserts that some of the officials involved in the investigation of the Cooper case were themselves at some time the subject of criminal investigations, the most significant of which in his view was San Bernandino Sheriff's Department Crime Lab manager William Baird. The district court already considered Cooper's allegation that the prosecution should have informed him about Baird's termination from the Sheriff's Department in 1988 (three years after the trial and five years after the investigation occurred), and determined that there was no Brady or Agurs violation[3] and no reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. That other officials have been investigated for matters unrelated to the Cooper case is largely irrelevant. Cooper suggests that the Brady duty extends through post-conviction proceedings, but even if so the duty would be to disclose information that was material to trial. Finally, so far as tampering with the DNA testing (which occurred during post-conviction proceedings) is concerned, the state trial court determined in its evidentiary hearing that Cooper's claims lacked merit, and we resolved in connection with Cooper's motion for a second habeas corpus petition that nothing claimed about the DNA testing satisfies the requirements for a second or successive application.
 
 
 23
 Failure to disclose exculpatory evidence (claim three). Cooper's application asserts that the prosecution knew about, and suppressed, Baird's alleged heroin use, failed to disclose information that three Hispanic males who were in jail on other charges in the summer of 1984 discussed their participation in the Ryen murders, and that the warden did not think that the tennis shoes that left the prints were particularly unique. However, none of this information is newly discovered.
 
 
 24
 Unreliable or altered testimony of Joshua Ryen (claim four). Cooper claims that Joshua Ryen's perceptions and recollections changed and were unduly influenced by law enforcement. Cooper also claims that the state's interference deprived him of relevant testimony. However, this is not newly discovered.
 
 
 25
 Denial of access to the courts (claim five). Cooper claims that he was denied access to the courts because the state trial court refused on January 23, 2004 to accept his most recent petition for writ of habeas corpus and two discovery motions, and the California Supreme Court denied his petition without requesting informal briefing. We discern no constitutional violation cognizable on federal habeas review. There is nothing untoward about the superior court deferring to the supreme court, particularly given the time exigencies involved, and Cooper's claims were adjudicated by the supreme court on the merits. The superior court had already denied Cooper's request for additional, mitochondrial DNA testing and found that it would shed no light on the outcome of the trial.
 
 
 26
 Evidence about bloody coveralls (claim six). As Cooper acknowledges, the claim regarding the destruction of the bloody coveralls has been raised in every available forum, and has been denied in every forum.
 
 
 27
 Ineffective assistance of counsel (claims seven, eight and nine). Cooper raises three claims that he was denied effective assistance of counsel with respect to the Koon confession, the bloody coveralls together with Lee Furrow's possible participation in the murders, and evidence of brown and blond hairs in the victims' hands that could not have come from Cooper. Nothing averred about the Koon confession is newly discovered. We previously determined that an ineffective assistance claim based on it would be a second or successive petition and denied leave to proceed with respect to it. Cooper v. Calderon, 274 F.3d at 1275. In any event, as the district court determined, the Koon confession was not material so even if counsel were deficient, there would be no prejudice. Nor is there anything new about connecting the coveralls to Lee Furrow or the fact that the victims were clutching hairs or fibers differently colored from Cooper's.
 
 
 28
 Either because the claims were previously raised and are now barred, 28 U.S.C. § 2244(b)(1), or were previously known or discoverable, 28 U.S.C. § 2244(b)(2)(B)(i), and because the facts underlying the claims in light of the evidence as a whole do not show clearly and convincingly that no reasonable factfinder would have found Cooper guilty, 28 U.S.C. § 2244(b)(2)(B)(ii), Cooper's application fails to satisfy the requirements of AEDPA and must be dismissed.
 
 IV
 
 29
 Cooper argues that apart from AEDPA, he has shown actual innocence sufficient to preclude imposition of the death penalty, Herrera, 506 U.S. 390, or that he has at least made a strong enough showing of innocence to permit consideration of procedurally barred claims under Schlup, 513 U.S. 298. Carriger, 132 F.3d 463. We do not believe that the standard for either is met.
 
 
 30
 There are two types of actual innocence claims. A freestanding claim of actual innocence does not require due diligence, and protects the entirely innocent. The threshold for establishing actual innocence regardless of constitutional error at trial is "extraordinarily high." Carriger, 132 F.3d at 476 (quoting Herrera, 506 U.S. at 417 (O'Connor, J., concurring)). We have held that it is higher than the standard to invalidate a conviction because of insufficient evidence, which is that no rational finder of fact could convict beyond a reasonable doubt in light of all the presently available evidence. Id. Rather, a freestanding claim of innocence requires affirmative proof of innocence. Id. Put differently, a petitioner making a freestanding claim of actual innocence "must present evidence of innocence so strong that his execution would be `constitutionally intolerable even if his conviction was the product of a fair trial.'" Id. at 478 (quoting Schlup, 513 U.S. at 316).
 
 
 31
 Cooper has not affirmatively proved his actual innocence by "`reliable evidence not presented at trial.'" Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). At most he alleges the stuff of which cross-examination is made, not evidence that he did not do it. See Carriger, 132 F.3d at 477 ("Although the postconviction evidence he presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove Carriger's innocence.").
 
 
 32
 However, "[w]hile a petitioner making a Herrera claim must present evidence of innocence so strong that his execution would be `constitutionally intolerable even if his conviction was the product of a fair trial,' a petitioner making a miscarriage of justice claim need only present evidence of innocence strong enough `that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" Carriger, 132 F.3d at 478 (quoting Herrera, 506 U.S. at 442-44 (Blackmun, J., dissenting)) (italics in original) (internal quotation marks omitted). To permit consideration of a procedurally barred claim, a petitioner must show that "in light of all the evidence, including new evidence, `it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Id. (quoting Schlup, 513 U.S. at 327).
 
 
 33
 Other circuits have stated that the Schlup "gateway" has been codified in AEDPA and requires a petitioner to show a factual predicate which could not have been discovered through due diligence, and that would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of the offense. See, e.g., David v. Hall, 318 F.3d 343, 347 n. 5 (1st Cir. 2003) ("In AEDPA Congress adopted a form of actual innocence test as one component of its threshold requirements for allowing a second or successive habeas petition; but it also provided that this second petition is allowed only where the factual predicate for the claim of constitutional error could not have been discovered previously through the exercise of due diligence.") (citing 28 U.S.C. § 2244(b)(2)(B)); Flanders v. Graves, 299 F.3d 974, 977 (8th Cir. 2002) (stating that the Schlup "gateway" to consider otherwise procedurally barred claims is "partially codified" in AEDPA at § 2244(b)(2)(B)(ii)); see also In re Minarik, 166 F.3d 591, 600 (3rd Cir. 1999) (stating that AEDPA "significantly altered" the showing a petitioner is "required to make in order to proceed on new claims in a second petition," by requiring a petitioner to show actual innocence and that the factual predicate for the claim could not have been previously discovered through due diligence); cf. United States v. Barrett, 178 F.3d 34, 48 (1st Cir. 1999) (referring to the "actual innocence" exception to the bar on second or successive petitions as part of the pre-AEDPA test).
 
 
 34
 Were we to adopt this reasoning of other circuits, Cooper's lack of due diligence would foreclose his actual-innocence-as-a-gateway argument. But we do not need to resolve this question because Cooper cannot show actual innocence under either the "clear and convincing" AEDPA § 2244(b)(2)(B)(ii) requirement, or the "more likely than not" Schlup requirement. To the extent that AEDPA does not codify Schlup, we believe for the same reasons that no sufficient showing for a second or successive application is made, that none is made for purposes of Schlup.
 
 
 35
 In addition to what we have already explained, even if Cooper were entirely correct that the post-conviction DNA testing to which he agreed was deficient, and even if Dan Gregonis, the San Bernardino County criminalist who Cooper claims contaminated evidence to incriminate him did contaminate evidence to which he had access, the other items of evidence to which the criminalist did not have access also inculpate Cooper. That would include a hand-rolled cigarette butt recovered from the Ryen station wagon, a hatchet (one of the murder weapons) with blood and hair evidence, that part of the blood-stained T-shirt which matched Cooper's DNA, and a blood-stained button found in the Lease house. Of course, the jury convicted Cooper without the benefit of DNA evidence, and a reasonable jury could find him guilty even without the incriminating results and even if cross-examination of the criminalist would show that he was negligent or corrupt or both in connection with it. In any event, the state trial court explicitly found that no such conduct occurred. Finally, there is no reasonable likelihood that mitochondrial DNA testing would be probative of innocence, for any number of people could have come and gone through the Ryen house leaving hairs.
 
 
 36
 In sum, neither singly nor in combination do these items establish Cooper's innocence, or show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. To the contrary, there was clear and compelling evidence that linked Cooper to the crime. After escaping from prison, he stayed at the Lease house that was next door to the Ryens' home; his blood was found on the hallway wall opposite the master bedroom door of the Ryen house; shoe print impressions in the Lease house matched the pattern of prison-issued shoes and one of them was bloody; cigarette butts and tobacco in the Lease house and Ryens' station wagon were prison-issued; a blood-stained khaki green button identical to buttons on field jackets worn by inmates at Chino Institute for Men was found on the rug in the bedroom that Cooper used in the Lease house after the murders; a hatchet was missing from the Lease house and its sheath was found in the bedroom that Cooper used; and that bedroom and its bathroom, which had been cleaned earlier that day, showed signs of blood after the murders. See People v. Cooper, 53 Cal.3d at 795-800 (detailing the evidence of guilt).
 
 
 37
 As we deny Cooper's application for authorization to file this successor petition, and no other ground appears for issuing a stay, we also deny his request for a stay of execution.
 
 
 38
 APPLICATION DENIED.
 
 BROWNING, Senior Circuit Judge, dissenting:
 
 39
 Kevin Cooper is scheduled to be executed at one minute after midnight on Tuesday, February 10, 2004. He seeks two things.
 
 
 40
 First, Cooper wants to test two pieces of blood evidence for the presence of a preservative. Recent DNA tests of a blood spot and a bloody t-shirt have produced a positive DNA match for Cooper. Cooper contends there has been tampering and that his blood was placed on the evidence after it was collected. A simple and inexpensive test for a preservative in the blood will determine whether he is correct. The test would show whether the blood on the spot and on the t-shirt had a chemical used by crime laboratories to preserve blood samples in their possession.
 
 
 41
 Second, Cooper wants to test strands of long blond or light brown hair found clutched in the hand of Jessica Ryen, one of the murder victims. We already know the hair did not come from Cooper, an African-American. Cooper contends Jessica pulled the hair from one of her killers. Photographs in the record clearly show that the amount of hair is substantial, and it is clutched in Jessica's hand. The test could rule out the hair having come from one of the victims. There is evidence in the record to indicate that the crime was committed by three Caucasian men. Thus the test could also corroborate that evidence.
 
 
 42
 The State has been asked to permit these two tests, but refuses. As justification for its refusal, it states that Cooper had a fair trial, that the evidence of Cooper's guilt is overwhelming, and that it needs to proceed with Cooper's execution.
 
 
 43
 Contrary to the State's assurances, Cooper did not have a fair trial. Cooper has presented a sworn declaration of a state prison warden that, if believed, suggests that the State fabricated crucial evidence linking Cooper to the murders for which he has been convicted. Nor is the evidence of Cooper's guilt overwhelming. Indeed, as the evidence mounts that the State used unreliable and fabricated evidence to convict Cooper, the evidence of his guilt correspondingly diminishes.
 
 
 44
 There should be no hurry to execute Cooper. If he is truly guilty, these simple tests will resolve the matter. If he is truly innocent, those same tests will tell us that. When the stakes are so high, when the evidence against Cooper is so weak, and when the newly discovered evidence of the State's malfeasance and misfeasance is so compelling, there is no reason to hurry and every reason to find out the truth.
 
 I. Nature of the Current Proceedings
 
 45
 Cooper has applied for authorization to file a second or successive petition for habeas corpus under 28 U.S.C. § 2244(b)(3)(A). We must grant authorization if we find that Cooper has made a prima facie case for relief under a second or successive petition. "By `prima facie showing' we understand simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." Woratzeck v. Stewart, 118 F.3d 648, 650 (9th Cir. 1997) (quoting Bennett v. United States, 119 F.3d 468, 469 (7th Cir. 1997)) (emphasis added).
 
 
 46
 There are two possible standards that Cooper must satisfy.
 
 
 47
 First, if Cooper's claims are entirely governed by 28 U.S.C. § 2244 because he is seeking to file a second or successive petition, he must show that
 
 
 48
 (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
 
 
 49
 (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
 
 
 50
 28 U.S.C. § 2244(b)(2)(B)(i) and (ii).
 
 
 51
 Cooper has presented newly discovered evidence, including evidence of a constitutional violation in the form of a significant violation of Brady v. Maryland, 373 U.S. 83 (1963). Based on the record before us, there is a prima facie case that Cooper could not previously have discovered this evidence through the exercise of due diligence. In addition, Cooper has presented previously known evidence that is newly relevant because of intervening events since he last sought authorization to file a second or successive petition. Cooper's new evidence constitutes a "factual predicate" for the claims he seeks to present in his petition for habeas corpus. If Cooper's new evidence is believed and "viewed in light of the evidence as a whole," he has made out a prima facie case that such evidence would be "sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).
 
 
 52
 Second, if Cooper's claims are governed by the more lenient standard of Schlup v. Delo, 513 U.S. 298 (1995), he need not satisfy the "clear and convincing evidence" requirement of § 2244(b)(2)(B)(ii). As long as he has satisfied the requirement of § 2244(b)(2)(B)(i) that the factual predicate of his claim "could not have been discovered previously through the exercise of due diligence," Schlup would require only that he "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." 513 U.S. at 327. If Cooper's new evidence is believed, and considered in light of the record as a whole, Cooper has made out a prima facie case that would entitle him to relief under the "more likely than not" standard of Schlup.
 
 
 53
 We do not need to decide whether the "clear and convincing evidence" standard of § 2244(b)(2)(B)(ii) or the "more likely than not standard" of Schlup applies. Cooper has made out a prima facie case under either standard.
 
 II. Background
 
 54
 On June 2, 1983, Cooper escaped from the minimum security area of the California Institute for Men ("CIM") where he was incarcerated. He broke into and hid in an empty house in Chino Hills, about two miles away, in San Bernardino County, southeast of Los Angeles. The house was owned by a man named "Lease." Cooper made telephone calls from the Lease house to his girlfriend asking for money, but she refused to help him. Cooper's last call from the house was at about 8:00 pm on June 4.
 
 
 55
 The Ryens lived next door, about 125 yards away from the Lease house. During the night of June 4, 1983, the members of the Ryen household were viciously attacked. Doug and Peggy Ryen, the father and mother, were killed, as were their ten-year-old daughter, Jessica, and an eleven-year-old house-guest, Chris Hughes. Doug and Peggy's eight-year-old son, Josh, was left for dead but survived. The bodies of Doug, Peggy, Jessica, and Chris, as well as the still-living Josh, were discovered the next day by Chris's father. All of the murder victims were killed by multiple chopping, cutting, and puncture wounds. Josh suffered the same type of wounds. Jessica was found clutching a substantial amount of long blond or light brown hair in her hand, some of which had roots attached.
 
 
 56
 Cooper was apprehended at the end of July 1983, and he was tried for capital murder in late 1984 and early 1985. Cooper took the stand and testified that he was innocent. He has consistently maintained his innocence. Cooper testified at trial that he never went to the Ryen house. He testified that he left the Lease house after that last phone call at 8:00 pm on June 4 and hitchhiked to Mexico. Uncontradicted evidence at trial indicated that Cooper checked into a hotel in Tijuana at about 4:30 pm the next day, June 5. After seven days of deliberation, the jury found Cooper guilty of death-eligible first degree murder. After four additional days of deliberation, the jury sentenced Cooper to death.
 
 III. Newly Discovered Evidence
 
 57
 Cooper seeks authorization to file a second or successive habeas application based on newly discovered evidence. Cooper attaches two new sworn declarations, both signed in January 2004, which, if believed, would indicate that crucial evidence may have been fabricated. Evidence presented at trial showed that Cooper left a bloody shoe print on a sheet in the Ryens' bedroom. A newly presented declaration by the then-Warden of CIM at Chino, if believed, demonstrates both that the State committed a clear violation of Brady v. Maryland, and that the State likely fabricated the evidence of the shoe print.
 
 
 58
 Cooper also presents new evidence, as well as pre-existing but newly relevant evidence, pertaining to recent DNA testing by the State. In 2001, the State tested three items of evidence for the presence of Cooper's DNA: a blood spot in the hallway of the Ryen house; blood on a t-shirt found beside the road three days after the murders; and saliva on two hand-rolled cigarettes the State claims to have found in the Ryens' abandoned station wagon. Cooper seeks additional testing of the blood to determine if a preservative is present. The presence of a preservative would show that Cooper's blood was planted. If believed, Cooper's evidence — both new and newly relevant — would suggest evidence tampering.
 
 
 59
 Finally, Cooper presents a declaration of Christine Slonaker, who states that she was in a Chino Hills bar on the night of the murders. She says she encountered two blond Caucasian men — one in a light colored t-shirt and jeans, the other in overalls, and both wearing tennis shoes — who were inebriated and spotted with blood. The declaration is new evidence, dated February 7, 2004, and if believed, would further corroborate pre-existing but newly relevant evidence that Cooper was not the man who committed the Ryen/Hughes murders.
 
 A. The Bloody Shoe Print
 
 60
 Only two pieces of evidence at trial directly connected Cooper to the Ryen house. One was a bloody tennis shoe print found on a sheet in Doug and Peggy's bedroom. The other was a single spot of blood found on a wall in the hallway.
 
 
 61
 Several people testified at trial about the shoe print found on the Ryens' bedsheet. Several testified that Cooper had a new or close-to-new pair of "Pro-Ked Dude" tennis shoes. One key witness testified that prints from a "Pro-Ked Dude" shoe were found on the sheet in the Ryen house, on the shower sill in the Lease house, and in the game room in the Lease house. "Pro-Ked Dude" tennis shoes are manufactured by Stride Rite solely for distribution in prisons and other institutions. They are not distributed to the general public.
 
 
 62
 The testimony of two witnesses, William Baird and James Taylor, was particularly important on this point. The California Supreme Court specifically discussed and relied on their testimony in sustaining Cooper's conviction on direct appeal. People v. Cooper, 53 Cal.3d 771, 797-98 (1991).
 
 
 63
 William Baird was the Crime Laboratory Manager, in charge of collecting and analyzing evidence connected to the Ryen/Hughes murders. The sheet from the Ryens' bedroom was not initially thought to have any footprints. A bloody footprint was discovered on the sheet after it was taken to the lab. Baird's assistant, David Stockwell, testified that the footprint could be seen when the sheet was folded the same way it had been folded when in the Ryens' bedroom (thereby bringing together two parts of the footprint that were separated when the sheet was flat). (Exhibit 191.)[1] Baird testified that the shoe print on the sheet matched two prints found in the Lease house, and that the prints had been made by a close-to-new "Pro-Ked Dude" shoe, made for and distributed only to prisons. (Exhs. 99, 210). Baird further testified that he had a close-to-new "Pro Ked Dude" shoe of approximately the same size in his lab, previously obtained from another prison. He testified that this shoe allowed him to analyze the print on the sheet and determine that it came from a prison-issued "Pro-Ked Dude" shoe. (Exh. 210.)
 
 
 64
 James Taylor was an inmate at the CIM during the time Cooper was incarcerated there. Taylor was a recreation attendant at the prison. As part of that job, he issued tennis shoes to inmates. Taylor testified at trial that he initially gave Cooper a pair of "P.F. Flyer" tennis shoes. He testified that Cooper, then imprisoned under the false name of David Trautman, exchanged his "P.F. Flyers" for a pair of black "Pro-Ked Dudes" a few days before he was transferred to the minimum security area. (Exh. 103.) Cooper escaped from the prison soon after he was transferred to the minimum security area.
 
 
 65
 Cooper attaches two recent declarations as exhibits to the habeas petition he seeks to file. The first is a hand-written sworn declaration of James Taylor, dated January 8, 2004, which states:
 
 
 66
 1. I was an inmate at the Reception Center West (RC-W) at the California Institute for Men in Chino California in May and June of 1983.
 
 
 67
 2. During that period of time, I met David Trautman, whose real name I understand to be Kevin Cooper. I met Kevin when he tried out for the basketball team. My job at the prison was recreation attendant. I was responsible for issuing basketball shoes to men in our unit who played on the team.
 
 
 68
 3. I issued only one pair of shoes to Kevin Cooper. I issued him a pair of P.F. Flyers. This brand was the best brand of shoe for basketball that the prison stocked. Kevin did not trade these shoes in to me for a pair of Keds, nor did he trade these shoes in to me for any other pair. (Exh. 100.) Second, and more important, Cooper attaches a sworn declaration of Midge Carroll, who was Warden of CIM at Chino while Cooper was incarcerated there. Warden Carroll's declaration, dated January 30, 2004, states:
 
 
 69
 1. I was the Superintendent, or Warden, of the California Institution for Men at Chino, California, from 1982 through 1985. As Warden of this state penal facility, I had extensive contact with members of the San Bernardino Sheriff's Department who were responsible for the investigation of Kevin Cooper as a suspect in what became known as the Chino Hills Murders.
 
 
 70
 2. I was employed by the California Department of Corrections from 1966 until I permanently retired in 1999. . . .
 
 
 71
 3. As the Warden of the California Institute for Men at Chino, my contact with San Bernardino County deputy sheriffs about aspects of the investigation in the Kevin Cooper case included conversations with one of the lead detectives about shoeprint evidence found at the crime scene. I communicated to one of the lead investigators that the notion that the shoeprints in question likely came only from a prison-issue tennis shoe was inaccurate. I came to this conclusion after conducting a personal inquiry of the appropriate staff, including the deputy warden, the business manager responsible for procurement, and the personnel responsible for warehousing. I learned that the shoes we carried were not prison-manufactured or specially designed prison-issue shoes. I learned that the shoes were common tennis shoes available to the general public through Sears and Roebuck and other such retail stores. I passed this information along to the detective. Had I been contacted, I would have testified to this on behalf of either the prosecution or defense, and I would have provided supporting documentation.
 
 
 72
 (Exh. 101.)
 
 
 73
 Both the Taylor and the Carroll declarations are newly discovered evidence. The Taylor declaration, by itself, is not particularly helpful to Cooper. It is, of course, a recantation of extremely important evidence introduced at trial, but a mere recantation by a non-governmental agent, absent an accompanying constitutional violation, is not a sufficient ground for habeas relief.
 
 
 74
 The Carroll declaration, on the other hand, discloses a clear Brady violation. Under Brady v. Maryland, 373 U.S. 83 (1963), the prosecution has a constitutional obligation to turn material exculpatory evidence over to the defendant. This obligation is independent of any specific request by the defendant for such information. United States v. Agurs, 427 U.S. 97, 107 (1976). The duty extends to impeachment as well as exculpatory evidence. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 676 (1985); see also Strickler v. Greene, 527 U.S. 263, 280 (1999); Kyles v. Whitley, 514 U.S. 419, 433-34 (1995).
 
 
 75
 The significance of Warden Carroll's communication must have been clear to the San Bernardino Sheriff's Department investigators. They knew they had little or no direct evidence connecting Cooper to the Ryen house. The "Pro-Ked Dude" tennis shoe print provided that evidence. Because of the testimony of Baird and Taylor, the State was able to tell a damaging story about the presence of a bloody "Pro-Ked Dude" footprint in the bedroom of the murder victims, a footprint only Cooper, an escaped prisoner, could have left. But if Warden Carroll had been put on the stand and had been believed by the jury, the State's story would have been shown to be untrue.
 
 
 76
 The failure of the State to provide Cooper with the information that Warden Carroll gave to the San Bernardino Sheriff's Department, and that she now provides in her declaration, was unquestionably a Brady violation. Such a Brady violation meets the threshold requirement in 28 U.S.C. § 2244(b)(2)(B)(i) that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence."
 
 
 77
 It is the State's withholding of the Warden's evidence, rather than any lack of diligence, that explains why Cooper's attorneys have not presented this evidence before. See Jaramillo v. Stewart, 340 F.3d 877, 882 (9th Cir. 2003) (explaining in the context of cause for procedural default that failure to discovery a Brady claim lies with the state if the petitioner had no reason to know of state's withholding); cf. Strickler, 527 U.S. at 287-88 ("[A] defendant cannot conduct the `reasonable and diligent investigation' . . . to preclude a finding of procedural default when the evidence is in the hands of the state."); Julius v. Jones, 875 F.2d 1520, 1525 (11th Cir.), cert. denied, 493 U.S. 900 (1989) (Brady claim not procedurally barred because defendant may "rely on a belief that prosecutors will comply with the Constitution and will produce Brady material on request"). If the Warden's declaration is believed, the State misled Cooper's attorneys by asserting that the prison issued "Pro-Ked Dude" shoes. We should not penalize Cooper by transforming the State's constitutional violation into Cooper's lack of diligence.
 
 B. DNA Testing
 
 78
 As soon as DNA testing became technologically possible, Cooper asked that it be done on the evidence in his case. The State finally consented to DNA testing on three items: a spot of blood found in the hall of the Ryen house; a t-shirt found beside the road three days after the murders; and two hand-rolled cigarette butts the State purportedly found in the Ryens' abandoned station wagon in Long Beach, California.
 
 
 79
 The DNA testing was performed by a laboratory of the California Department of Justice in Berkeley, California in 2001. The result was a positive match for Cooper for all three items. Cooper seeks to present newly discovered evidence surrounding the DNA testing. Cooper also seeks to present previously known but newly relevant evidence — evidence that takes on a new meaning in light of the DNA testing.
 
 1. The Blood Spot from the Hall
 
 80
 A blood spot, marked in evidence as A-41, was taken from the hall in the Ryen house. Daniel Gregonis, the criminologist for the San Bernardino Sheriff's Department, testified at trial that this blood was consistent with Cooper's. Gregonis was impeached at trial based on deficiencies in his testing of the physical evidence, particularly including the A-41 spot.
 
 
 81
 Cooper presents newly discovered evidence of tampering with A-41 prior to DNA testing. When it came time for the DNA testing, Cooper's defense team noticed that Gregonis had simultaneously checked out A-41, as well as samples of Cooper's blood and saliva, for a 24-hour period on August 13 and 14, 1999. (Exh. 146.) According to Gregonis, this was done at the direction of the District Attorney in order to determine whether A-41 still existed. (Exh. 105.) Although Gregonis claims that he did not open the glass bindle that contained the pillbox that contained the A-41 sample when it arrived for testing at the DNA lab in 2001, Gregonis's initials were present on the tape that seals the package. (Exhs. 36, 38, 94.) In common laboratory practice, a seal with an individual's initials on it indicates that the individual opened a bag, and constitutes the only record of the evidence bag being opened. (Exh. 106.) The presence of Gregonis's initials suggests that, contrary to his sworn testimony, Gregonis opened the bag containing A-41. Further, the seal protecting A-41 from contamination was different when counsel viewed it in 2001, compared to when it was viewed in 1998. (Exhs. 36, 38.)
 
 
 82
 Cooper also presents evidence, not available at trial, that the sample has changed physical form since the trial. In 1995, A-41 consisted of plaster chips in a metal pillbox. In 1998, however, it consisted of a capped vial that contained white chips and the metal pillbox, inside of which was a smaller vial containing more white chips. In 2001, A-41 consisted of a vial with white chips and a metal pillbox with an empty vial inside.
 
 
 83
 The evidence of tampering with A-41 was not available to the defense at the time of trial. Moreover, Cooper presented this evidence to the California courts as soon as they learned of it, when DNA testing occurred in 2001. Cooper's counsel could not have reasonably been expected spontaneously and repeatedly to check all of the evidence logs when there was no reason for the State to have checked out the evidence. Rather, they discovered that Gregonis had accessed the evidence when the sample was taken to be tested in 2001. They raised the issue before the state courts soon thereafter.
 
 
 84
 This newly discovered evidence suggests the possibility that A-41 was contaminated with Cooper's blood or saliva, both of which he had also checked out at the same time. Such contamination would, of course, invalidate the results of the DNA testing. The newly discovered evidence of tampering is particularly important when considered in light of other mishandling of evidence adduced at trial. Gregonis testified that he had conducted a blind study of A-41, in which he tested the sample without knowing that Cooper was a suspect. (Ex. 147.) However, his own notes belie that fact. He knew Cooper was a suspect and had a sample of his semen by which he would have known which enzymes in the blood in A-41 would tie Cooper to the sample.
 
 
 85
 This was not the only time Gregonis may have used an improper scientific technique or contradicted himself at trial. When Gregonis conducted further testing, he did so by placing A-41 and Cooper's blood side-by-side for comparison. Although he initially denied doing so, he changed testimony when given his own laboratory notes that indicated otherwise. (Exh. 151.) Reflecting the problems of not having performed a blind study, Gregonis apparently changed his initial results of tests on A-41 so that Mr. Cooper's enzyme profile would match that of the donor of the A-41 sample, admitting that he had changed his notes after the fact only when confronted by counsel at trial. (Exhs. 152, 12.)
 
 2. The Bloody T-Shirt
 
 86
 Cooper presents no newly discovered evidence directly relevant to the bloody t-shirt. As already recounted, however, Cooper has presented newly discovered evidence suggesting that the "Pro-Ked Dude" shoe print on the sheet from the Ryens' bedroom may have been fabricated. Cooper has also presented evidence from which one may draw a conclusion of possible tampering with the A-41 sample. The inference of tampering with that sample is, of course, made stronger if it is shown that the same was done with other evidence.
 
 
 87
 As detailed below, there is also already-known evidence linking the t-shirt to a potential suspect, Eugene Leland ("Lee") Furrow. Furrow's girlfriend, Diana Roper, and Roper's sister, Karee Kellison, have provided declarations stating that Furrow came home early in the morning on the night of the murders, driven in a brown station wagon containing several people. Previously that evening, Furrow had been wearing a Fruit-of-the-Loom t-shirt that Roper described as identical to the bloody t-shirt found beside the road and introduced into evidence. Furrow was no longer wearing the t-shirt. Instead, he was wearing coveralls that were spattered with blood. Furrow took off the coveralls, put them in the closet, and departed quickly. Roper strongly suspected that Furrow was involved in the Ryen/Hughes murders and turned the coveralls in to the police. As will be recounted below, these coveralls were never turned over to the defense, but were, instead, thrown away by the police into a dumpster.
 
 
 88
 Cooper has not been able to determine the precise mechanism by which his blood might have been placed after the fact on the t-shirt. However, he has provided enough evidence, both newly discovered and already known, to raise a reasonable suspicion that there has been tampering with the t-shirt.
 
 3. The Hand-Rolled Cigarettes
 
 89
 Cooper presents newly discovered evidence that the hand-rolled cigarette butts tested for the presence of his DNA were not those introduced as evidence at trial in 1984. One of the butts, designated V-12, had measured 4 mm long when it was introduced at trial. (Exh. 95.) However, when it was tested in 2001 for the presence of Cooper's DNA, that same butt measured 7 mm in length. (Exh. 98.) This suggests either mishandling or tampering, and calls into question the DNA test linking Cooper to the Ryens' station wagon in which the butts were supposedly found. As with the A-41 sample, Cooper had no reason to check the length of the cigarette butt until the DNA testing occurred.
 
 
 90
 The import of this new evidence becomes clear in light of evidence available at trial that the origin of the cigarette butts was questionable, and that the butts, like other evidence, changed in form between trial and DNA testing. The circumstances of how the cigarette butts were found is somewhat suspicious. Although police found in the Lease house several cigarette butts of the type ultimately found in the Ryen car in Long Beach, only one of those cigarette butts was logged into evidence. (Exhs. 33, 18.) During an initial investigation of the station wagon, Detective Hall made no mention of any hand-rolled cigarette butts of the type smoked by Cooper. He did, however, find and inventory other small pieces of evidence in the area in which the cigarette butts were ultimately found. (Exh. 17.) Further, Detective Hall found other cigarettes in the car, although these cigarettes were subsequently lost. Only during a second search of the car, conducted by other criminologists, was one cigarette butt of a type issued in prisons found. (Exh. 22.) This is the butt (V-12) on which the DNA testing was done.
 
 
 91
 V-12 appears to have been mishandled before and during trial. During a pre-trial hearing on July 12, 1984, Gregonis testified that V-12 appeared to have been Cooper's. However, he said that independent verification of this fact would be impossible due to the fact that he "exhausted the sample." (Exh. 169.) However, V-12 appeared at trial, albeit not in cigarette form but rather in a metal container containing tobacco and the tobacco paper. (Exh. 97.) This disappearance and reappearance of V-12 is similar to the disappearance and reappearance of A-41, the blood spot which was also supposedly exhausted, only to reappear when further testing was needed. (Exhs. 12, 153.)
 
 
 92
 Given this evidence of mishandling, it is a permissible inference that the cigarette butt tested for DNA was not actually the butt introduced at trial; that the tested butt had not been found in the Ryens' car in Long Beach; or that, in any event, the cigarette butt evidence had been so mishandled as to render any DNA test, at the very least, unreliable.
 
 C. Slonaker Declaration
 
 93
 In a declaration dated February 7, 2004, Christine Slonaker provides new information about the night of the Ryen/Hughes murders. (Exh. 212.) Slonaker recounts that on that night, she was with two friends at the Canyon Corral Bar in Chino Hills, and two men came into the bar. "Both men were Caucasian and had blond hair. One of them was wearing a light colored t-shirt and jeans. The other man was wearing overalls. Both men were wearing tennis shoes . . . they appeared to be under the influence of drugs." From afar, she thought that they were covered in mud, but they approached her and her friends, and while they were engaged in conversation, Slonaker realized that it was not mud. "The spots on them were blood. Most of the blood was on their shoes and the front portion of their clothes. They also had blood splatters on their face and arms." Slonaker recalls asking them: "Do you realized you are covered in blood?" One of Slonaker's friends also told one of the men: "Get off of me. You're covered in blood."
 
 
 94
 Slonaker recounts that the men were refused service, and escorted out of the bar. Shortly thereafter, a police officer arrived at the bar. The following morning, Slonaker heard about the Ryen/Hughes murders, but did not report what she had seen because she assumed that the police had been aware of the two strange men after seeing an officer that night at the bar.
 
 
 95
 The Slonaker declaration is a new piece of evidence suggesting that someone other than Cooper committed the Ryen/Hughes murders. It corroborates and reinforces evidence discussed below.
 
 IV. Other Evidence
 
 96
 The newly discovered evidence, particularly the Brady evidence introduced by the Carroll declaration, substantially changes the State's case against Cooper. Under either 28 U.S.C. § 2244(b)(2)(B)(ii) or Schlup, our task is to evaluate the newly discovered evidence in light of all the other evidence in the record. In the material that follows, I summarize both evidence that was presented at trial and evidence that has been unearthed since then. Viewing the totality of this evidence in light of the Carroll declaration, I conclude that Cooper has made out a prima facie case that entitles him to file his second or successive petition for habeas corpus.
 
 
 97
 Warden Carroll's declaration casts doubt on the authenticity of the shoe print on the sheet taken from the Ryens' bed-room. The State knew from Warden Carroll that the prison did not have special prison-issue shoes. Nevertheless, the State put on witnesses testifying to precisely the contrary. William Baird, the Crime Laboratory Manager, testified that he had a "Pro-Ked Dude" shoe in his lab, to which he matched the "Pro-Ked Dude" print on the Ryens' sheet. But we now know from Warden Carroll that it was highly unlikely for there to have been a "Pro-Ked Dude" print on the sheet, because "Pro-Ked Shoes" are special-issue prison shoes. We also know from Warden Carroll that Cooper could not have had such shoes, and we know that there is no reasonable possibility that anyone else would have had such shoes. Failing to turn over this information was a clear Brady violation, and the reliability of the "Pro-Ked Dude" evidence was undermined.
 
 
 98
 The following is the evidentiary picture into which we must fit this new knowledge. We know that during the night of June 4, 1983, the members of the Ryen household were viciously attacked, and that four out of the five members of the household were killed. Josh, the Ryens' eight-year-old son, survived. Josh had been cut in the throat and was unable to speak when he was first taken to the hospital. But he was able to communicate by pointing to letters and numbers. He told his interviewers that three or four men had done the killings. (Exhs. 53, 54, and 55.) He was separately asked if any of the men were black or had dark skin. He said no. (Exh. 53.) While still in the hospital, he saw a picture of Cooper on television. He said that Cooper had not done it. (Exh. 60.) Detective Hector O'Campo took notes of the interviews. He left out of his notes Josh's statements about multiple killers. (Exh. 68.) Several other people in the hospital (including a nurse, a doctor, and his grandmother) heard Josh say that there were multiple killers, and that he had never seen Cooper before. (Exhs. 57, 59, 61.)
 
 
 99
 A year and a half later, Josh testified by videotape that Cooper had done the killing. At trial, he recounted seeing a man with a "puff of hair." At the time of his arrest, a month and a half after the murders, Cooper wore his hair in an Afro; Cooper was seen on television at the time of his arrest in his Afro. However, at the time he escaped from prison, Cooper wore his hair in braids. (Exh. 73.) There were no recovered hairs from a black person in the Lease house, indicating that Cooper had not combed out his braids in the house. (Exh. 167.)
 
 
 100
 The pathologist who performed autopsies on the victims initially believed that multiple people had done the killings, given the number and varied nature of the wounds. (Exh. 63.) He later testified that the killings could have been done by a single person, and testified that he only considered this after it was suggested to him by investigating officers. (Exh. 63.)
 
 
 101
 A blood-stained hatchet was found beside the road some distance from the house. A beige Fruit-of-the-Loom t-shirt was also found beside the road (at a different location) about 3 days after the killings. Cooper did not have such a t-shirt when he left prison, and the owner/occupants of the Lease house had no such t-shirt. (Exh. 29.) There was also no evidence that the t-shirt came from the Ryen house.
 
 
 102
 The Ryens kept a truck and a brown station wagon in their driveway. They left their keys in the ignitions of both vehicles. (Exh. 78.) After the murders, the brown station wagon was missing. It was found several days later (different witnesses testify to different dates) in a church parking lot in Long Beach. (Exh. 17.) Long Beach is on the coast, just south of Los Angeles. It is almost 50 miles due west of Chino Hills. Tijuana, where Cooper checked into a hotel at 4:30 pm on June 5, is just across the border into Mexico, slightly over 100 miles south of Chino Hills.
 
 
 103
 Nothing appears to have been taken from the Ryen house. Money left exposed on the counter remained. (Exh. 79.) Peggy Ryen's purse, containing money and numerous credit cards, was left undisturbed. (Exh. 78.)
 
 
 104
 The police testified that the following things were found in the Lease house: hand-rolled cigarettes butts with a type of tobacco issued in California prisons; a blood-stained button consistent with those found on jackets issued by California prisons; a blood-stained hatchet sheath; and evidence that there might have been some washed-away blood (visible through the use of "Luminol") in the shower and sink, and in spots in the hall that could have been footprints.
 
 
 105
 Although Cooper smoked many hand-rolled cigarettes while he was in the Lease house, only one was logged into evidence. (Exhs. 33, 167.) As discussed above, the State's handling of the cigarette butt evidence was dubious. The hatchet sheath was found in plain sight on a bedroom floor during a second search of the Lease house, but that was after it had been searched previously and the sheath was not detected. The police officer who had previously searched the bedroom denied that he had been in it; however, his fingerprints were found on a closet in the bedroom.
 
 
 106
 The evidence presented by the State of washed-away blood is also weak. Luminol reacts to blood, but also to certain metals, vegetable matter, and cleaning agents. It is impossible to tell without follow-up testing which of the possible reactants is causing the reaction. Furthermore, Luminol is extremely sensitive, detecting at a sensitivity level of between 1 part per million and 1 part per ten million. It can detect reactants that have existed unnoticed for years and after many washings. The fact that Luminol reacted with the sink and shower does not even establish clearly that there was any blood in them, let alone when it had been deposited.
 
 
 107
 Cooper's blood was not found in the Ryen house, except (perhaps) on the disputed spot on the wall in the hallway, A-41. That spot was tested and mishandled by state criminalist, Daniel Gregonis, as described above.
 
 
 108
 Not only is the evidence that was presented by the State at trial weak, there is also considerable evidence that the Ryen/Hughes murders were committed by three other men. In a declaration dated November 21, 1998, Diana Roper told the following story which was never presented at trial: during the early morning hours on the night of the murders, her then-boyfriend, Lee Furrow, came home, in a car driven by others. "Lee and Debbie walked through the front door. They were in a hurry. I heard the car depart. Lee was wearing long sleeve coveralls with a zipper in the front. The coveralls were splattered with blood. . . . He did not have the beige T-shirt or Levis on that he was wearing earlier in the day." (Exh. 82.) Furrow left the coveralls and quickly departed with Debbie on a motorcycle. (Id.)
 
 
 109
 Roper recounted that the bloody t-shirt introduced into evidence was similar to the t-shirt Furrow had worn the day of the murders: "The T-shirt in this photograph looks exactly like the T-shirt Lee was wearing on June 4, 1983 including the manufacturer, the size, the color and the pocket. I am absolutely positive the photograph of this T-shirt matches the T-shirt that Lee was wearing at our house the afternoon of June 4, 1983." (Id.) According to Roper, this was the same t-shirt she had previously bought for Furrow.
 
 
 110
 It is unclear, by contrast, how Cooper would have obtained a t-shirt like the one later found bloodied. No Fruit-of-the-Loom t-shirts were distributed at the prison. The occupants of the Lease house have provided evidence that none of them had such a t-shirt. And there was no such t-shirt in the Ryen house.
 
 
 111
 Roper also thought that she recognized the hatchet: "[A] few days after the murders I heard on the news that a hatchet was found near the crime scene in Chino. I immediately walked to the washer area of our house. Lee's hatchet was missing. . . . The hatchet [introduced into evidence at the trial] looks like the hatchet . . ., which I found missing after the Ryen/Hughes murders. I cannot say for sure if it is the same hatchet that Lee owned but the curvature of the handle is the same. Even more striking in similarity than the curvature of the handle is the style of the handle, which has a sort of an American Indian pattern to it." (Id.)
 
 
 112
 In the same declaration, Roper recounted: "Prior to meeting me, Lee was convicted of the murder of Mary Sue Kitts. Lee confided in me that he not only killed Mary Sue Kitts, but he also dismembered her body and threw the body parts in the Kern River." (Id.) Furrow strangled Mary Sue Kitts at the direction of Clarence Ray Allen. People v. Allen, 42 Cal.3d 1222, 1237-38 (1986). Allen is currently held under sentence of death in a California prison.
 
 
 113
 Roper's sister Karee Kellison was in the house with Roper that night. In a declaration dated November 15, 1998, Kellison recounted the same story about the arrival and departure of Lee and Debbie. "Lee was wearing long sleeve coveralls, which were spattered with blood." (Exh. 197.) She also recounted, "I saw Lee and Debbie get out of a car. There was not sufficient light to identify who the other occupants in the car were. However, there was enough light to see that it was a station wagon, kind of brown in color." (Id.)
 
 
 114
 Christine Slonaker's February 7, 2004 declaration, (Exh. 212.), corroborates Roper's and Kellison's accounts of the night of the Ryen/Hughes murders. Slonaker encountered two Caucasian men — one wearing a light-colored t-shirt — at the Canyon Corral Bar in Chino Hills on the night of the murders, both of whom were covered in blood. Slonaker's account is supported by pre-existing evidence from Canyon Corral Bar employees. The bartender and manager testified that Causasian men, whom they described as being extremely inebriated, had been in the bar on the night of the murders, one wearing a light-colored or beige t-shirt. (Exhs. 30, 31.) The bartender testified that the men were refused service and asked to leave the bar, corroborating Slonaker's account.
 
 
 115
 After Roper heard about the murders, Roper called her father to ask him to come to her house to confirm her opinion that they were spattered with blood. He agreed with her that they were. Five days after the murders, Roper gave the coveralls to Detective Eckley and told him that she thought they were connected to the Ryen/Hughes murders. Eckley then contacted Detective Benge, who instructed him to write a report and forward it to Sergeant Arthur, the chief investigating officer in the homicide division. (Exh. 194.) On June 10, 1983, Sergeant Stodelle told Arthur about the contents of Eckley's report about the coveralls. (Exh. 200.) Eckley's report clearly recounts Roper's story that Furrow had come home with the bloody coveralls on the night of the murder; that he had left them in the closet at her house; that he had been paroled three years before from his sentence for killing Mary Sue Kitts; and that she believed that the coveralls were connected to the Ryen/Hughes murders. (Exh. 194.)
 
 
 116
 Arthur made no attempt to recover the coveralls from Eckley. (Exh. 83.) Eckley made several attempts to contact the homicide division in June and July 1983, but his telephone calls were not returned. (Exh. 185.) The preliminary hearing in Cooper's case began on November 9, 1983. On December 1, the day the defense began its presentation, Eckley threw away the coveralls in a dumpster. (Exh. 185.) In May 1984, the Kellison-Roper family contacted Cooper's trial counsel about the coveralls. This was the first information he had received about them. It was not until December 1998 that an investigator for Cooper discovered a disposition report for the coveralls. It contained the initials "K.S.," which suggests that Eckley did not act independently in disposing of the coveralls.
 
 
 117
 Independent information given investigators in 1984 by Anthony Wisely, then an inmate at Vacaville, develops more fully the account provided by Roper and Kellison. Wisely told Detective Woods on December 19, 1984, that he had smoked marijuana with a certain Kenneth Koon while in prison. (Exh. 85.) He recounted to Woods that Koon had told him that he had participated in the Ryen/Hughes murders. (Id.) Roper was romantically involved with both Koon and Furrow around the time of the murders.
 
 
 118
 In his report, Woods wrote that Wisely told him that Koon told him the following. Koon was with two other men that were in the BRAND or the Aryan Brotherhood, and they had driven to a residence in Chino on the night of the Ryen/Hughes murders. Two men got out of the car and were in the house for about ten or fifteen minutes. One of the men was carrying two axes or hatchets, and also was wearing gloves. When the men returned to the car, one of them stated that "the debt was officially collected." Wisely said that "Koon thinks they hit the wrong house[.]" Koon said that one of the men involved "was very upset because they apparently had left one kid alive." (Exh. 85.)
 
 
 119
 Roper stated in her declaration, "I heard Lee say many times there are three rules to follow anytime you do a crime. They are wear gloves, never wear your own shoes and never leave a witness alive." (Exh. 82.) Nikol Gilberson, in a declaration signed November 21, 1998, stated that she was Lee Furrow's girlfriend from late 1983 to late 1984. She recounted in her affidavit that Lee Furrow "on several occasions" told her these same three rules.
 
 
 120
 This evidence against Cooper, taken as a whole and viewed in the light of the State's Brady violation, is extremely weak. There is also a plausible story told by Roper, Kellison, Slonaker and Koon (told through Wisely) that the true murderers are Furrow, Koon and another person. Cooper has clearly made out a prima facie case that entitles him to file his second or successive petition for habeas corpus.
 
 V. Conclusion
 
 121
 Based on the foregoing I would authorize Cooper to file his proposed petition for habeas corpus. I would also grant a stay of execution.
 
 
 
 Notes:
 
 
 [1]
 These facts are taken fromCooper v. Calderon, 255 F.3d 1104 (9th Cir. 2001).
 
 
 [2]
 On Saturday night, February 7, at 11:18 p.m. Cooper's counsel transmitted to the court a February 7, 2004 declaration of Christine M. Slonaker. It relates her experience at the Canyon Corral Bar on the night of June 4-5, 1983. Others who were at the Bar at the same time testified at trial about the behavior of three strangers who came to the bar that evening. To the extent that Slonaker's account twenty-one years later differs from that of other percipient witnesses, it just "serves to undercut the evidence presented at trial, not affirmatively to prove [Cooper's] innocence."Carriger, 132 F.3d at 477. If, on the other hand, the new evidence places Cooper's claim in "a significantly different and stronger evidentiary posture," then the state courts have to be given an opportunity to consider it "in the first instance." Aiken v. Spalding, 841 F.2d 881, 883-84 & n. 3 (9th Cir. 1988). In that case, the federal courts could not consider it because Cooper has failed to exhaust his state remedies.
 
 
 [3]
 Brady v. Maryland, 373 U.S. 83 (1963); United States v. Agurs, 427 U.S. 97 (1976).
 
 
 [1]
 I refer to the exhibits as they are numbered in the habeas petition that Cooper now seeks permission to file